**PLEASANT et al. v. MISSOURI–KANSAS–TEXAS R. CO.**

No. 775.

Circuit Court of Appeals, Tenth Circuit.
Aug. 4, 1933.

Rehearing Denied Sept. 13, 1933.

W. A. Huxman, of Hutchinson, Kan. (Payne H. Ratner, of Parsons, Kan., and Ernest E. Blincoe, of Topeka, Kan., on the brief), for appellants.

W. W. Brown, of Parsons, Kan. (Joseph M. Bryson, of St. Louis, Mo., on the brief), for appellee.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

McDERMOTT, Circuit Judge.

The plaintiff below, appellee here, filed this suit to enjoin the collection of its 1929 taxes. The defendants are the tax-collecting officers of the 17 counties through which plaintiff's railroad runs, and the state officials who made the assessment complained of. The jurisdiction of the court is invoked on account of diversity of citizenship and the presence of a substantial federal question.

1. *Jurisdiction of Single Judge.* While a temporary injunction was prayed for and allowed, there was no request to assemble a three-Judge court under section 266 of the Judicial Code (28 USCA § 380) and the cause has proceeded to this stage with no mention of the point. If the cause is cognizable under section 266, neither the trial court nor this court has jurisdiction. Stratton v. St. Louis S. W. R. Co., 282 U. S. 10, .51 S. Ct. 8, 75 L. Ed. 135. We have examined the record, therefore, and conclude that it is

not so cognizable. The bill of complaint, inferentially at least, alleges that the state officers joined as defendants had concluded their task, and had made the returns to the county officers as required by section 79—605, R. S. Kan. 1923. No facts are alleged as to further action contemplated by such state officers which it is sought to enjoin; the substantial relief prayed for is against county officers charged with the duty of collecting the tax. This case thus falls squarely within the principles announced in Henrietta Mills Co. v. Rutherford County (D. C. N. C.) 26 F.(2d) 799, and since the Supreme Court affirmed the later decision of the single Judge who tried that case, 281 U. S. 121, 50 S. Ct. 270, 74 L. Ed. 737, without noticing any jurisdictional defect as it did in the Stratton Case, it can be taken as settled that the case at bar is not a three-Judge case. The machinery of the Kansas taxing statutes distinguishes the case from Norfolk & Western Railway Company v. Board of Public Works of West Virginia (D. C. W. Va.) 3 F. Supp. 791, 795. The multiplicity of actions necessary to recover at law, as well as the failure to raise the question, distinguishes the case from the Henrietta Mills Case, supra, and Matthews v. Rodgers, 284 U. S. 521, 52 S. Ct. 217, 76 L. Ed. 447. The ground is therefore clear for a disposition of the controversy on its merits.

2. *The Pleadings.* The bill alleges that the value of plaintiff's taxable property in Kansas does not exceed $20,872,331; that the State Tax Commission, after a view, assessed it at such figure on May 18, 1929; that thereafter, on June 18, the Tax Commission wilfully, arbitrarily, and fraudulently raised the assessment to $24,057,559; that thereupon plaintiff filed two successive petitions praying that the Commission equalize and correct this valuation, because erroneous methods were used in arriving at it, and because of discrimination; that extensive hearings were held and the petitions denied; that by these steps, plaintiff's administrative remedies were exhausted. The bill then alleges that rural real estate in Kansas is assessed at 65 per cent., and urban real estate at 55 per cent., of their values, while plaintiff's property was assessed at 150 per cent. of its value; that such assessment was in pursuance of a deliberate, intentional, concerted, fraudulent, and systematic effort to wrong the plaintiff, thereby denying to plaintiff its rights under the Fourteenth Amendment to the Federal Constitution, and under the Constitution of the state of Kansas.

The defendants denied any discrimination, and alleged that the Tax Commission had, to the best of its ability, followed the statutory mandate to assess all property at its actual value in money, and that plaintiff's property was assessed and equalized upon the same basis and at the same value as other property in the state, so far as it was possible to do considering the different nature and use of plaintiff's property; that if the practices of the Commission have resulted in other property being assessed at less than actual value, the same percentage of value was applied to plaintiff's property.

A similar suit, involving the 1930 taxes, was filed. The issues are essentially the same, and the cases were tried as one.

3. *Trial Proceedings.* The issues so joined were referred to W. P. Dillard, Esq., an able and experienced master. He took the testimony of 135 witnesses, and received more than 100 exhibits, many of them voluminous. He made detailed findings of fact, accompanied by helpful comments on the applicable law. He found the value of plaintiff's Kansas property to be $24,543,533.61 in the year 1929, and $25,328,734.07 in 1930, amounts slightly in excess of the assessments under attack. To these figures, the master applied a differential of 74.16 per cent. for 1929 and 72.46 for 1930, which he found to be the ratio which assessed values of other property bore to actual value. He reduced the assessments accordingly, and concluded that the collection of taxes on any higher assessments should be enjoined.

Detailed exceptions were taken by the defendants to the report of the master, argued and denied. A final decree was entered enjoining defendants from collecting taxes in excess of those found to be owing on the master's assessments. The trial court found that defendants' pleaded defense that all property in the state was assessed at its true value was not sustained by the evidence; that while plaintiff's property was assessed at approximately its actual value, other properties were assessed at only about 75 per cent. of their value. If the record is in accord, the conclusion drawn by the trial court is correct. A critical examination of the record persuades us that there was no substantial proof of such discrimination; that property in the state generally was assessed at somewhere around 75 per cent. of its value, and that the assessments under attack are about 75 per cent. of what the Commission concluded was the value of the Kansas property of plaintiff, $32,000,000. This appeal brings under re-

view the correctness of the final decree. Our task has been lightened by the fair and able presentation of the matter by counsel on both sides.

4. *General Rule Applicable.* It may be well, at the outset, to take our bearings—to ascertain the part which the judiciary plays in the matter of raising the public revenues. Ad valorem taxes require a valuation of all taxable properties. The power to value or assess is delicate, difficult and dangerous. An improper exercise thereof may readily drive an institution into bankruptcy, for "the power to tax is the power to destroy." At this critical period, it is of peculiar importance that taxes of the great transportation companies be fairly laid, in order that they may continue to exist and continue their substantial support to our local and state governments. Notwithstanding the vital nature of the power to assess, it is also important that public revenues be promptly collected; furthermore, while the valuation of property requires judgment, it does not require expert legal knowledge.

The power of assessment, vital though it be, must be lodged somewhere. In Kansas, and generally, it is lodged in the administrative branch of the government, and not the judicial. Mistakes will be made, whether the valuation be made by a Commission, a jury, or a court. Courts therefore do not supervise the actions of assessing bodies, nor sit to correct their errors of judgment. Where the assessing body has failed to follow a legislative mandate, or where it has pursued a systematic course of intentional discrimination, or has been guilty of fraud, or arrived at value by the use of fundamentally erroneous principles, recourse may be had to the courts. But proof of mistake or inequality is not enough. State Railroad Tax Cases, 92 U. S. 575, 613, 23 L. Ed. 663; Pittsburgh, C. C. & St. L. Railway Co. v. Backus, 154 U. S. 421, 435, 14 S. Ct. 1114, 38 L. Ed. 1031; Coulter v. Louisville & Nashville R. Co., 196 U. S. 599, 25 S. Ct. 342, 49 L. Ed. 615; Louisville & Nash. R. Co. v. Greene, 244 U. S. 522, 536, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97; Sunday Lake Iron Co. v. Wakefield, 247 U. S. 350, 38 S. Ct. 495, 62 L. Ed. 1154; Chicago G. W. R. Co. v. Kendall, 266 U. S. 94, 98, 45 S. Ct. 55, 69 L. Ed. 183; Cumberland Coal Co. v. Board of Revision, 284 U. S. 23, 52 S. Ct. 48, 76 L. Ed. 146; Iowa-Des Moines Nat. Bank v. Bennett, 284 U. S. 239, 52 S. Ct. 133, 76 L. Ed. 265. In Chicago, B. & Q. R. Co. v. Babcock, 204 U. S. 585, 598,

27 S. Ct. 326, 329, 51 L. Ed. 636, Justice Holmes said:

"The board was created for the purpose of using its judgment and its knowledge. State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663; State v. Savage, 65 Neb. 714, 768, 769, 91 N. W. 716; In re Cruger, 84 N. Y. 619, 621; San Jose Gas Co. v. January, 57 Cal. 614, 616. Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The state has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end."

And, in Chicago G. W. R. Co. v. Kendall, 266 U. S. 94, 98, 45 S. Ct. 55, 57, 69 L. Ed. 183, Chief Justice Taft said:

"It is not enough, in these cases, that the taxing officials have merely made a mistake. It is not enough that the court, if its judgment were properly invoked, would reach a different conclusion as to the taxes imposed. There must be clear and affirmative showing that the difference is an intentional discrimination and one adopted as a practice."

5. *Systematic Discrimination.* Upon the issue of a systematic and intentional discrimination, plaintiff introduced the testimony of some 17 appraisers that farm and city property was assessed at 71.88 per cent. of its value; it introduced U. S. Census Reports showing an assessment in these counties of 82 per cent. of value; and much other evidence, some of it of doubtful significance, purporting to show that various classes of property in Kansas were assessed at many different percentages of actual value. Defendants introduced testimony of the Tax Commissioners, the County Clerks of the 17 counties, and of 67 appraisers who appraised 9,734 tracts of land. This evidence disclosed that assessed values were more than 90 per cent. of actual values.

The findings of the master, approved by the trial court, on this mass of conflicting evidence are entitled to great respect. While we doubt whether it is possible to arrive at a precise percentage applicable to all classes of property, the record fairly supports the conclusion that property generally is assessed in Kansas at less than its true value, and that such debasement is about 25 per cent. That such is the practice of the Commission and other assessing bodies is not denied; the contention of defendants is that the true

value of plaintiff's property in Kansas was about $32,000,000, and that when it was assessed at $24,000,000, the same 75 per cent. yardstick was applied to plaintiff's property as was applied to other property. The Tax Commissioners, their adviser, and their counsel, testified affirmatively that the assessed value of plaintiff's property did not represent their judgment as to its actual value; that its true value was reduced to make it comparable to the assessment of other property.

Nor did the master rest his decision upon the question of discrimination. After finding that the Commission erred in its finding of system value and in its allocation to Kansas, the master's concluding finding is:

"That in 1929 and 1930 the Tax Commission of the state of Kansas, as the Board of Railroad Assessors, adopted and used wrongful principles of valuation and erroneous methods of allocation, in valuing the state property of plaintiff for taxation; that the adoption and use of such wrongful principles and erroneous methods were persistent, intentional and wilful and resulted in an illegal discrimination against plaintiff and imposed upon plaintiff an unjust and unfair share of the burden of taxation, and gives to plaintiff the right of relief in a court of equity."

The affirmative testimony of the assessors is not, of course, controlling; if the evidence clearly discloses that plaintiff's property was assessed at full value, there is here an unconstitutional discrimination. Nor may assessors boost their finding of true value in order to nullify the effect of applying a debasement percentage. If, on the other hand, the record fails to disclose bad faith or the use of fundamentally erroneous principles in arriving at a true valuation of $32,-000,000, then there is no discrimination in an assessment of $24,000,000. If the record does disclose such bad faith or use of erroneous principles, the tax is illegal for such reasons, and also because of discrimination. The case therefore turns on these questions to be shortly considered.

 Plaintiff contends that defendants are estopped by the statute and their answer to assert that plaintiff's property was assessed at less than its true value. The statute (R. S. Kan. 1923, 79—501) requires that all property be assessed at full value, but in the absence of systematic discrimination, courts cannot set aside assessments because they are less than actual value. So to do would be to set aside every assessment in Kansas.

If all property is assessed at 75 per cent. of its value, plaintiff cannot complain that its property was not assessed at 100 per cent. In Greene v. Louisville & Interurban R. Co., 244 U. S. 499, 515, 516, 37 S. Ct. 673, 680, 61 L. Ed. 1280, Ann. Cas. 1917E, 88, dealing with a "fair value" statute, the court said:

"It is equally plain that it makes no difference what basis of valuation—that is, what percentage of full value—may be adopted, *provided it be applied to all alike.* * * * It follows that the duty to assess at full value cannot be supreme in all cases, but must yield where necessary to avoid defeating its own purpose."

Reading the answer as a whole, it is reasonably clear that defendants, while protesting that all property was assessed at full value, qualified that statement by an allegation that if the Commission had assessed other property at less than its full value, plaintiff had been accorded the same treatment in that respect as other taxpayers. If pleadings are to be as rigidly construed as plaintiff now urges, its case would fall because the facts found by the master disclose that its property was assessed at less than its value, whereas its bill alleged that it was assessed at 150 per cent. thereof.

 6. *Bad Faith.* It is contended that the assessment was raised at the instigation of the Governor, for political purposes. If the final assessment is correct, it cannot be invalidated because a Governor insisted that a correct assessment be made. A statute makes it the duty of the Tax Commissioners to "consult and confer with the Governor and Attorney General" concerning the discharge of their duties. R. S. Kan. 1923, 79—1404 (13). The Governor did not initiate any step in this assessment; he was consulted by one of the Commissioners as to an adjustment of railroad taxes generally, and he procured certain data from the Public Service Commission for the use of the Tax Commission. This is no evidence of bad faith.

7. *Value of System.* The parties agree that the proper method of assessing the property of an interstate railroad is to find the value of the system as a whole, and then allocate that value to the states through which it passes. This method was used by the Tax Commission.

The Commissioners did not testify to an exact figure found to be the system value, but the method used, applied to the figures furnished by the plaintiff, discloses that the system was valued at about $190,000,000.

The Commission arrived at that value primarily by a composite of the stock and bond method with a capitalization of earnings at 6 per cent., giving some consideration to investment and cost of reproduction. The Commission probably included in the system value about $10,000,000 of deposits in banks, useful for working capital, to retire maturing bonds, and as a reserve for emergencies.

The plaintiff, by the use of the stock and bond method alone, and excluding deposits in banks, arrives at a system value of $164,000,000 for 1929 and $178,000,000 for 1930.

The master combined the stock and bond method with the capitalized earnings method, except that he found the Commission erred in using 6 per cent. instead of 7 per cent. The master, using 7 per cent., and excluding bank deposits, found a system value of $171,000,000 for 1929 and $178,000,000 for 1930.

We have considerable doubt of the power of a court to substitute its judgment of the system value for that of a Commission under this record. Even if the court were convinced that the valuation of the Commission was too high, it would be powerless to correct it unless the mistake came about by the application of fundamentally erroneous principles. The authorities heretofore cited conclusively show that courts do not try these cases de novo; on the contrary, the scope of their inquiry is limited. We resolve the doubt in favor of plaintiff, and notice the points of difference.

▪ (a) The right of the Commission to consider the earnings of the system as one of the guides to its value is challenged, notwithstanding the fact that the master's finding of value, which we are asked to confirm, is predicated in part upon that method. Capitalization of earnings is a proper guide to value. The Supreme Court has approved of that method in at least four cases: Adams Express Company v. Ohio State Auditor, 165 U. S. 194, 222, 17 S. Ct. 305, 41 L. Ed. 683; Louis. & Nash. R. Co. v. Greene, 244 U. S. 522, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97; Illinois Cent. R. Co. v. Greene, 244 U. S. 555, 37 S. Ct. 697, 61 L. Ed. 1309; Southern R. Co. v. Com. of Kentucky, 274 U. S. 76, 47 S. Ct. 542, 71 L. Ed. 934. Judge Cooley, in his work on Taxation (4th Ed.) 1682, likewise approves. And so has the Eighth Circuit Court of Appeals. Atchison, T. & S. F. R. Co. v. Sullivan, 173 F. 456; Chicago & N. W. R. Co. v. Eveland, 13 F.(2d) 442, 443. In the latter case, Judge Walter H. Sanborn said:

"In determining the value of the property of a railway company for the purposes of taxation, several classes of evidence are admissible; but the net earnings of the property and the market value of its stocks and bonds for a reasonable period antecedent to the making of the assessment constitute the most reliable and influential evidence of that value."

The capitalization of earnings method is more dependable, particularly in times of wild speculation, than the value of stocks and bonds. In this case, the value of stocks and bonds increased $14,000,000 in a year with no corresponding increase in the properties of the system. At present, and during the years in question, the stock market reflected the hopes or fears of a speculating public more accurately than the taxable values of roadbed and equipment. Judge Northcott, speaking for Judge Parker, Judge McClintic, and himself, convincingly denied this contention of plaintiff in Norfolk & Western Railway Company v. Board of Public Works of West Virginia, supra.

▪ It is said that the Kansas statute forbids such consideration. Section 79—602, R. S. Kan. 1923, requires a railroad to furnish certain information as to its physical properties, together with a list of its outstanding securities and their market value. Section 79—604 provides that such return shall not be conclusive, but the Commission may make such assessment as "it may deem just and equitable." Power is conferred upon the Commission to ascertain all facts "touching the business, property, money and credits" of the railroad. If the question had arisen upon the enactment of the statute in 1876, a forcible argument might have been made that the Legislature by enumerating, intended to limit the inquiry of the Commission. Such doubt as might have originally existed has been dispelled by the years of administrative construction. For many years, capitalization of earnings has been a factor in the valuation of all railroads of Kansas. Legislatures, repeatedly meeting, have not disturbed this interpretation, and it is thereby deemed to have legislative approval. United States v. Dakota-Montana Oil Co., 288 U. S. 459, 53 S. Ct. 435, 77 L. Ed. 893; Mass. Mutual Life Ins. Co. v. United States, 288 U. S. 269, 53 S. Ct. 337, 77 L. Ed. 739; Ramsey v. Commissioner (C. C. A. 10) 66 F.(2d) 316.

▪ (b) The Commission capitalized the net revenues furnished to it by the company on a 6 per cent. basis. The master used 7 per cent. Both percentages are in the zone

of reason, and within that zone the courts may not substitute their judgment for that of the administrative body upon whom the burden rests. Six per cent. is the rate of interest on judgments in Kansas; it is considered a good return on non-speculative investments; a return over that sum is subject to partial recapture by the Transportation Act of February 28, 1920. 49 USCA § 15a(6). Capitalization on a 6 per cent. basis for assessment was sustained in Louisville & Nash. R. Co. v. Greene, 244 U. S. 522, 537, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97. The master increased the basis to 7 per cent. because of the assertion that the net income returned by plaintiff to the Commission included depreciation reserve for roadway accounts. It appears that under the uniform system of accounting prescribed by the Interstate Commerce Commission, no depreciation for roadway is set up. The record fails to disclose that any such reserve is necessary; if maintenance and replacement in kind without betterment are chargeable to operating expenses, there is no proper place for a depreciation reserve. This may be the case, for in Vol. 177, I. C. C. 351, the statement is made that the railroads contend that there should be no such reserve set up because "no depreciation exists in a railroad property which is maintained in 100% efficiency." In any event, there is no satisfactory basis in the record for assuming that 1 per cent. of the value of the entire system is necessary for a reserve for depreciation of roadways alone. The Commission used the figures which plaintiff gave to it as representing its net operating revenue; if it included something else, the burden was on the plaintiff to prove what else, and how much, was so included. This burden is not carried by an assumption made only in the briefs based on averages of railroad property generally.

■ (c) The Commission apparently included some $10,000,000 of moneys on deposit in eastern banks in arriving at system value. A railroad must have some working capital; it is an item of value to the system as a whole, included in rate bases in rate cases. Chicago, I. & L. R. Co. v. Lewis (D. C. Ky.) 12 F.(2d) 802. No other sum for working capital was included; plaintiff's auditor testified that these deposits would be considered as working capital. There was evidence that some cash had accumulated to retire bonds maturing; but such activities are a normal part of the plaintiff's business, and such cash increased the system value. Cash reserves held to weather a business

storm are not non-carrier property; railroads must run, in good times and bad, and it is good railroad operating to have a cash anchor to windward. There was no error in this regard.

Neither a finding of a system value of $190,000,000, nor the evidence as to the means of arriving at that value, supports the finding that the Commission used fundamentally erroneous methods reviewable by a court.

■ 8. *Allocation.* The Commission allocated approximately 16.7 per cent. of the system value to Kansas. The Commissioners, in their testimony, did not pretend to recall the precise calculations which resulted in the assessments complained of; they did testify to the methods used; the application of those methods to the figures introduced at the trial shows a system value of about $190,-000,000; a Kansas value of approximately $32,000,000, which is 16.7 per cent. of system value; and an assessed value of around $24,-000,000, which is roughly 75 per cent. of actual value. In making this allocation the evidence is that the Commission viewed the property in Kansas, and considered the main track mileage, the all-track mileage, the gross earnings, car and locomotive mileage, and traffic units, of Kansas as compared with the system, and perhaps other factors recommended by the National Tax Association. Of these, the factors given predominant weight were all-track mileage, gross earnings, and traffic units. Where terminals of unusual value were outside the state, allowance was made therefor; no such unusual situation exists in this case.

The plaintiff contends that main-track mileage only may be considered in allocation; and by excluding 40.6 miles of Frisco lines over which its trains run into Kansas City, arrives at a figure of 14.23 per cent.; if all-track mileage is used, the figure is 14.62 per cent.

The master used a composite of all-track mileage, main track mileage (exclusive of the Frisco track), and investment, and arrived at a figure of 14.26 per cent.

The question presented is not whether the plaintiff's and the master's methods of allocation are permissible; the question is, Did the Commission have a right to consider additional factors?

The propriety of using main-track mileage as a factor in allocation in the ordinary case, is not challenged by the defendants. In fact, the Commission used that factor. The disagreement arises over plaintiff's conten-

tion that the Commission has no right to consider any other factor.

This contention cannot be sustained. A comparison of main-track mileage may or may not be fair, depending on the circumstances. In South Dakota, for example, it was held unfair to so allocate system value, since there was no expensive construction there as there was in the states to the west, and not the valuable use there was in the states to the east. Chicago & N. W. R. Co. v. Eveland (C. C. A. 8) 13 F.(2d) 442. The same was held in Wallace v. Hines, 253 U. S. 66, 40 S. Ct. 435, 64 L. Ed. 782. While such unusual circumstances do not exist here, it cannot be said that main-track mileage is the only criterion for allocation.

It has been repeatedly held that the usefulness of a railroad must be considered in arriving at its value. The question of whether the producing power of tangible property is an element to be considered in arriving at its taxable value was forcibly presented by a petition for rehearing in Adams Express Company v. Ohio State Auditor, 166 U. S. 185, 221, 17 S. Ct. 604, 606, 41 L. Ed. 965, where the tangible properties were not a unit, as in the case of railroads. Nevertheless, Justice Brewer, in strong language, held that tangible property had a useful value that was taxable. He said:

"Suppose an express company is incorporated to transact business within the limits of a state, and does business only within such limits, and, for the purpose of transacting that business, purchases and holds a few thousand of dollars' worth of horses and wagons, and yet it so meets the wants of the people dwelling in that state, so uses the tangible property which it possesses, so transacts business therein, that its stock becomes in the markets of the state of the actual cash value of hundreds of thousands of dollars. To the owners thereof, for the purposes of income and sale, the corporate property is worth hundreds of thousands of dollars. Does substance of right require that it shall pay taxes only upon the thousands of dollars of tangible property which it possesses? Accumulated wealth will laugh at the crudity of taxing laws which reach only the one, and ignore the other; while they who own tangible property, not organized into a single producing plant, will feel the injustice of a system which so misplaces the burden of taxation."

In Southern R. Co. v. Com. of Kentucky, 274 U. S. 76, 81, 47 S. Ct. 542, 544, 71 L. Ed. 934, the Supreme Court held:

"The value of the physical elements of a railroad—whether that value be deemed actual cost, cost of reproduction new, cost of reproduction, less depreciation or some other figure—is not the sole measure of or guide to its value in operation. Smyth v. Ames, 169 U. S. 466, 547, 18 S. Ct. 418, 42 L. Ed. 819. Much weight is to be given to present and prospective earning capacity at rates that are reasonable, having regard to traffic available and competitive and other conditions prevailing in the territory served."

This rule has been uniformly adhered to in taxation and in rate cases. By contending for the stock and bond method, plaintiff concedes that use is a proper item entering into system value. If use should be considered in arriving at system value it should be considered in allocating a value reflecting that use.

A study of gross revenues, traffic units, and car mileage gives a better index to the useful value of a railroad than a measurement of its tracks. In the Eveland Case, failure to consider these items invalidated the tax, and an allocation on the basis of gross revenues and locomotive miles was upheld because it was fair and because it was the method "generally used and approved by the railroad companies of the nation and required by some of the states." In the Norfolk and Western R. Co. Case, supra, the Commission used the same factors used by the Commission here, and that court held that "We do not see how a fairer method could have been used." In Maine v. Grand Trunk R. Co., 142 U. S. 217, 228, 12 S. Ct. 121, 122, 35 L. Ed. 994, the Supreme Court characterized an allocation of a franchise tax by a comparison of gross receipts as "eminently reasonable, and likely to produce the most satisfactory results, both to the state and the corporation taxed." In Louisville & Nashville R. Co. v. Greene, 244 U. S. 522, 543, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97, it was held that a statute requiring the Tax Commission to consider track mileage in allocation did not prohibit it from also considering gross revenues. Without attempting to exhaust the authorities, it seems clear to us that a railroad carrying a large volume of traffic is of more value than one with little traffic; that such useful value should be considered; that in order to consider it, resort must be had to those facts which reflect use—gross earnings, traffic units, or train miles—or some of them.

█ The master excluded entirely the 40.6 miles of Frisco track which plaintiff uses to

get into Kansas City. The defendants contend that it should be treated as owned track for allocation purposes. The record does not disclose what weight the Commission gave to this trackage. Such mileage cuts no figure in the allocation on any other basis than track mileage, and the error, if any, was largely dissipated by the other factors of allocation used. It is clear that the value of the railroad is greatly enhanced by its entrance into Kansas City; without this operating agreement, it must either construct a line of its own with little revenue in return, or have its northern terminus at a small· town without connecting lines. It is also clear that it is not as valuable as an owned line. It should neither be excluded entirely nor included as owned trackage. In Louisville & Nash. R. Co. v. Greene, supra, it was held not to be error to consider controlled, but not owned, mileage in an ·allocation of the franchise value of a railroad company; the same considerations apply in appraising· the useful value of a railroad as apply in evaluating its franchise, for both are efforts to appraise an intangible but real value.

· It is also urged that the Commission should have deducted certain company-owned freight in arriving at traffic units; whether the Commission did consider this, or whether the amount is inconsequential, is not disclosed by the record. The tables made for the trial to establish defendants' contention of value must not be taken as indicating that the Commission arrived at its conclusion by the use of such tables.

Plaintiff argues that if Kansas, using these factors, arrives at a 16 per cent. allocation, other states may use other factors which will result in a combined allocation of more than 100 per cent. If the Kansas Commission uses proper factors, its action cannot be set aside because other states may use improper ones. In the Eveland Case, such an attempt was frustrated by the Eighth Circuit Court of Appeals, by enjoining the tax of the state which used mileage alone as a factor.

If only two factors are considered—the main track mileage contended for by plaintiff and the gross revenue method approved by the courts—and the resulting percentage is applied to a system value which averages stock and bonds and earnings capitalized at 6 per cent., the assessment is but 76.68 per cent. of actual value. Introducing other permissible factors results in still lower percentages. In fact, the assessment cannot be said to be discriminatory unless the earnings must, as a matter of law, either be capitalized at 7 per cent. or not used at all, and unless the allocation must, as a matter of law, ignore gross earnings, traffic units, and other factors reflecting use.

There was no error in using factors for allocation that reflected the use to which the plaintiff put its property in Kansas. The use of such permissible factors discloses that the value of the Kansas property is about $32,000,000.

9. *Conclusion.* The plaintiff has not carried the burden which rests upon a taxpayer who challenges an assessment. The affirmative evidence discloses that the same differential was applied to the property of plaintiff as was applied to other property. If plaintiff's system properties were valued and allocated without the use of fundamentally erroneous principles, the computations corroborate such affirmative testimony. In valuing the system, the Commission used approved methods with a permissible rate of return on earnings. In allocation, it considered factors which reflect the useful value of the property and which meet the test of reason and the decisions. If the assessment is higher than it should be, as the master and the trial court found, it is the result of a mistake which must be corrected, if at all, by the' Commission which made it; the courts cannot try anew all the assessments in the state.

The decree is reversed with directions to dismiss the bills.

Reversed.