## TEXAS–EMPIRE PIPE LINE CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2376.

Circuit Court of Appeals, Tenth Circuit.

March 23, 1942.

---

and J. Louis Monarch and Gerald L. Wallace, Sp. Assts, to the Atty Gen., on the brief), for respondent.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition to review an order of the Board of Tax Appeals.

Two questions are presented: (1) whether the Texas-Empire Pipe Line Company[1] realized a taxable gain upon the liquidation of its wholly-owned subsidiary corporation, the Texas-Empire Pipe Line Company of Illinois,[2] on December 1, 1932, and if so, the amount of that gain; (2) whether the dividend in the amount of $312,-572.50, which the subsidiary declared and paid on November 30, 1932, was an ordinary or a liquidating dividend.

The facts are not in dispute except as to the value of the assets liquidated.

In the fall of 1928, the Texas Corporation[3] and Empire Gas & Fuel Company,[4] whose subsidiary corporations were producers of crude oil in the Mid-Continent area, agreed to join in the construction of a pipe-line system for the transportation of crude oil from the Mid-Continent area to the refineries of such subsidiaries in Illinois and Indiana. It was intended that the pipe line would be used primarily to provide the requirements of such subsidiaries. Accordingly, on October 31, 1928, they organized the parent under the laws of the state of Delaware with an authorized capital stock of $18,000,000, divided into 720,000 shares of common stock of the par value of $25 per share. The parent was authorized to engage in and carry on the business of transporting petroleum and its products by pipe line and to construct, purchase, or otherwise acquire, and to own, maintain, and operate pipe lines, gathering branches, oil tanks, and water and gas lines in order to carry on such transportation.

The capital stock of the parent of the par value of $16,700,000 was issued equally to Texas and Empire at par for cash.

The laws of Illinois did not permit the parent to exercise the right of eminent domain for the purpose of acquiring lands and rights of way within Illinois. To overcome this obstacle, the parent organized the subsidiary, under the laws of the state of

B. H. Bartholow, of New York City (Irving H. Bull, W. G. Dunnington, and Roswell Magill, all of New York City, on the brief), for petitioner.

Warren F. Wattles, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen.,

---

[1] Hereinafter called the parent.
[2] Hereinafter called the subsidiary.
[3] Hereinafter called Texas.
[4] Hereinafter called Empire.

Illinois, with an authorized capital stock of $1,000,000. The subsidiary had substantially the same corporate powers as its parent.

The entire authorized capital stock of the subsidiary was issued to the parent and the subsidiary was credited with $1,000,000 on the books of the latter.

Construction of a pipe-line system from the Mid-Continent area to the refineries of subsidiaries of Texas and Empire at Lockport and Lawrenceville, Illinois, and at East Chicago, Indiana, was started in 1928 and completed in October, 1929.[5]

The subsidiary owned that part of the pipe-line system constructed east of the center of the Mississippi River, including six pumping stations in Illinois, and tankage, communications system, and general equipment located in Illinois and Indiana.

The subsidiary, on December 3, 1928, filed an application with the Illinois Commerce Commission for a certificate of public convenience and necessity to construct and operate a pipe line in Illinois. The certificate was granted January 9, 1929.

Acquisition of rights of way in Illinois and Indiana was started in September, 1928, and completed in July, 1929. Construction of the pipe-line system in Illinois and Indiana was started November 30, 1928, and completed in October, 1929.

The parent paid the cost of construction of that part of the pipe-line system, including pumping stations, tankage, communications system, and general equipment, owned by the subsidiary, but charged on its books all such expenditures to the subsidiary.

Transportation of oil began in October, 1929. The number of barrels of oil transported by the subsidiary for the years 1929 to 1932, inclusive, is set forth in the margin.[6]

The parent paid the operating expenses and the taxes of the subsidiary and charged on its books all such expenditures to the subsidiary.

All contracts for the transportation of crude oil were made between the shippers and the parent. The latter collected the charges for the transportation of the crude oil at rates contained in published tariffs filed with the Interstate Commerce Commission and apportioned the charges between itself and the subsidiary on a pro rata mileage basis. On its books, the parent credited the subsidiary with the share so apportioned to it.

The tariffs filed by the parent were similar to or identical with tariffs filed by other carriers of crude oil by pipe line from the Mid-Continent area to Illinois and Indiana refineries. Tariffs by carriers of crude oil by rail from the Mid-Continent area to refineries in Illinois and Indiana were approximately 50 per cent higher than tariffs by carriers of crude oil by pipe line.

The net income of the subsidiary, before deduction of Federal income taxes, for the years 1929 to 1932, inclusive, was as follows:

| | |
|---|---:|
| 1929 | $ 86,047.42 |
| 1930 | 1,544,921.28 |
| 1931 | 2,624,460.17 |
| 1932 (to Dec. 1) | 2,048,040.79 |
| Total | $6,303,469.66 |

[5] The states in which the pipe-line system was constructed and the number of miles of pipe line in each state, together with the sizes of the pipes, are as follows:

| States | Miles 4 inch | Miles 6 inch | Miles 8 inch | Miles 10 inch | Miles 12 inch |
|---|---|---|---|---|---|
| Oklahoma | ...... | ...... | ...... | 57.35 | 121.37 |
| Kansas | ...... | ...... | ...... | ...... | 37.62 |
| Missouri | ...... | ...... | ...... | ...... | 246.66 |
| Illinois | ...... | 31.22 | 137.46 | ...... | 260.53 |
| Indiana | .01 | 3.47 | ...... | ...... | 10.47 |
| Total | .01 | 34.69 | 137.46 | 57.35 | 676.65 |

| [6] Year | Barrels | Average Barrels Per Day | Per Cent of Maximum Capacity |
|---|---|---|---|
| 1929 | 1,933,362 | 23,000 | — |
| 1930 | 14,939,817 | 41,980 | 71 |
| 1931 | 19,763,774 | 54,150 | 78 |
| 1932 | 17,966,593 | 49,220 | 69 |

The Federal taxes for those years assessed against and paid by the subsidiary were as follows:

| Year | Rate | Amount |
|------|------|--------|
| 1929 | 12% | $ 9,465.22 |
| 1930 | 12% | 185,390.55 |
| 1931 | 12% | 314,935.23 |
| 1932 | 13¾% | 282,212.35 |
| Total | | $792,003.35 |

The parent and the subsidiary filed consolidated Federal income tax returns for the taxable years prior to 1932. In 1932, each filed a separate return. There was imposed for 1932 an additional income tax of ¾ of 1 per cent where consolidated returns were filed for that year.

On December 1, 1932, the estimated remaining economic life of the pipe-line system of the subsidiary was approximately 20 years based upon an average annual operation of 75 per cent of maximum capacity.

The total undepreciated cost of the pipe-line system, including pumping stations, tankage, communications system, and general equipment, owned by the subsidiary on December 1, 1932, was $6,221,332.11. The depreciated cost on that date was $6,021,665.67. The estimated replacement cost on that date, without diminution for depreciation, was $5,910,000, and the estimated replacement cost, diminished by depreciation at rates allowed for income tax purposes, was $5,100,000.

The rates to be charged by pipe-line companies are subject to regulation by the Interstate Commerce Commission. 49 U.S.C.A. § 1(1) (b); the Pipe Line Case (United States v. Ohio Oil Co.), 234 U. S. 548, 34 S.Ct. 956, 58. L.Ed. 1459. The Interstate Commerce Commission is empowered to make a valuation of the property of carriers, including pipe-line companies. 49 U.S.C.A. § 19a. It was stipulated that the Interstate Commerce Commission had made a tentative valuation report on the entire pipe-line system for rate-making purposes on December 31, 1934, wherein it fixed the valuation of the pipe-line system at $14,503,918. The valuation embraced a consideration of appreciation, depreciation, going concern value, and working capital. It was further stipulated that such valuation might be considered as a final valuation report by the Interstate Commerce Commission.

On January 9, 1932, the subsidiary filed an application with the Illinois Commerce Commission for authority to transfer its assets to the parent. Authority was granted on June 8, 1932. See Opinions and Orders, Illinois Commerce Commission, Vol. II. On December 1, 1932, at a meeting of the stockholders of the subsidiary, action was taken authorizing the complete liquidation of the subsidiary and the conveyance of all its property to the parent, its sole stockholder. On the same day, the subsidiary conveyed to the parent all its property, and in return therefor the parent canceled the indebtedness due it from the subsidiary in the amount of $4,701,705.44, assumed all the other liabilities of the subsidiary in the amount of $406,583.03, and surrendered to the subsidiary for cancellation all of the latter's stock which had a cost in the hands of the parent of $1,000,000.

On December 16, 1932, the subsidiary was duly and legally dissolved.

The books of account of the parent were kept and its Federal income tax returns were made on the accrual basis.

It was the regular practice of the subsidiary to pay out at the end of approximately three-month periods all its earnings and profits to the parent as dividends.[7] On November 30, 1932, it paid dividend No. 12 in the amount of $312,572.50.

| [7] Dividend Number | Date Payment | Amount | | [7] Dividend Number | Date Payment | Amount |
|---------------------|--------------|--------|---|---------------------|--------------|--------|
| 1 | 12/31/29 | $ 78,065.91 | | 8 | 12/31/31 | 1,316,943.62 |
| 2 | 3/31/30 | 220,819.23 | | 9 | 3/31/32 | 403,521.60 |
| 3 | 6/30/30 | 328,535.35 | | 10 | 6/30/32 | 536,537.50 |
| 4 | 9/30/30 | 404,768.88 | | 11 | 9/30/32 | 508,797.50 |
| 5 | 12/31/30 | 403,923.56 | | 12 | 11/30/32 | 312,572.50 |
| 6 | 3/31/31 | 384,414.71 | | | | |
| 7 | 6/30/31 | 608,166.62 | | | | $5,507,066.98 |

The Commissioner computed the profit on the liquidation as follows:

Assets Received

| | |
|---|---|
| Plant account at cost.... | $ 6,921,332.11 |
| Material and supplies at cost ................ | 29,790.69 |
| Accrued pipeage and prepaid items at cost..... | 56,832.11 |
| Value of intangibles..... | 8,959,445.05 |
| Dividend received 11/30/ 32 ................ | 312,572.50 |
| Total assets received.... | $16,279,972.46 |

Less:

| | | |
|---|---|---|
| Liabilities assumed... | $ 406,383.03 | |
| Depreciation Reserve.. | 899,666.44 | |
| Advances to subsidiary | 4,701,705.44 | |
| Cost of capital stock | 1,000,000.00 | 7,007,954.91 |
| Net Profit on liquidation | | $ 9,272,017.55 |

At the hearing before the Board, Albert D. Brokaw, an expert on valuation, testified that the fair market value of that part of the system formerly owned by the subsidiary was $11,100,000. He testified that "The method by which I arrive at my determination is based upon the present value of the return reasonably anticipated from operations." He used the earnings for 1931 and 1932. His valuation was predicated on an economic life for 20 years at 75 per cent of capacity. He assumed that the western portion of the system, being strategically located, would demand 20 per cent of the tariff as the originator of the oil carried and deducted 20 per cent on that account from revenues. He deducted Federal taxes on the basis of 13¾ per cent. He allowed $50,000 annually for management and overhead. He provided for a sinking fund that would equal $11,-103,976. He then applied Hoskold's Tables and found a valuation of $11,100,000.

He did not take into consideration the possibility of the rates being reduced by the Interstate Commerce Commission or make any allowance for that hazard.

The Board accepted his computation and found the fair market value of the assets of the subsidiary to be $11,100,000 on the date of its distribution and liquidation to the parent.

The Board also found that the dividend declared on November 30, 1932, was a liquidating dividend. It computed a deficiency accordingly.

■ I. The taxpayer contends that the corporate entity of the parent and the subsidiary should be disregarded and the latter regarded as a mere instrumentality of the former. We disagree. The subsidiary served two legitimate business purposes: (1) to acquire the power of eminent domain in Illinois, and (2) to reduce tax liability by filing a separate return for the year 1932. The case is, therefore, distinguishable from Inland Development Co. v. Commissioner, 10 Cir., 120 F.2d 986. Having elected to organize the subsidiary to serve legitimate business purposes, the parent must accept the attendant tax disadvantages.[8]

■ II. On January 9, 1932, the subsidiary filed an application with the Illinois Commerce Commission for authority to transfer its assets to the parent. Such authority was granted on June 8, 1932. The foregoing action manifests that a distribution in liquidation was contemplated long before the dividend in question was declared on November 30, 1932. On the following day, the stockholder of the subsidiary duly authorized the complete liquidation of the subsidiary and a conveyance of all its assets to the parent, its sole stockholder. The distribution of November 30, 1932, was not made in the ordinary course of business with intent to maintain the subsidiary as a going concern, but was paid after it had been decided to liquidate the subsidiary and was declared only one day prior to the formal action taken to effect distribution in liquidation.[9] These facts, we think, warranted the Board in finding that the dividend declared on November 30, 1932, was a part and parcel of the distribution in liquidation of the subsidiary.

[8] Higgins v. Smith, 308 U.S. 473, 476, 477, 60 S.Ct. 355, 84 L.Ed. 406; Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 419, 420, 53 S.Ct. 198, 77 L.Ed. 399.

[9] Canal-Commercial Trust & Savings Bank v. Commissioner, 5 Cir., 63 F.2d 619, 620, certiorari denied 290 U.S. 628, 54 S.Ct. 47, 78 L.Ed. 547; Holmby Corporation v. Commissioner, 9 Cir., 83 F.2d 548, 549, 550; Cf. Tate v. Commissioner, 8 Cir., 97 F.2d 658, 660.

III. Fair market value is the test for ascertaining the value of the assets distributed to the parent. § 111(b), Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Code, § 111(b).

The Interstate Commerce Commission, after months of intensive investigation in the field and "after careful consideration of all" available data, "including appreciation, depreciation, going concern value, working capital, and all other matters which" appeared "to have a bearing," fixed the value of the subsidiary's property for rate-making purposes as of December 31, 1934, at $5,946,606.38. It was stipulated that for the purposes of this case this should be regarded as the final valuation of the Interstate Commerce Commission.

The valuation made by the Interstate Commerce Commission, an independent agency of the United States, is presumed to have been correctly and impartially made.[10]

The Interstate Commerce Commission valuation was made as of December 31, 1934. Undoubtedly, the value of the subsidiary's assets was greater on that date than on December 1, 1932, for the reasons pointed out by the Supreme Court of the United States in West v. Chesapeake & Potomac Telephone Co., 295 U.S. 662, 673, 55 S.Ct. 894, 898, 79 L.Ed. 1640, wherein the court said:

"The price trend was gradually ascending from 1923 to 1929. It then suffered a precipitate decline so that at December, 1932, the date of the commission's valuation, it was at the nadir. Since then it has made a sharp recovery."

The record here reflects that the cost of reproduction new of the subsidiary's assets on December 1, 1932, was $5,910,000 as compared with $6,221,894 on December 31, 1934.

While a carrier is entitled to initiate rates by filing a tariff,[11] the Interstate Commerce Commission may investigate such rates either upon complaint or its own motion and if it finds that such rates are unjust or unreasonable, it is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate or charge, or the maximum or minimum rate or charge to be thereafter observed.[12]

The earnings enjoyed by the subsidiary in 1931 and 1932 on the rate base found by the Interstate Commerce Commission were not only unreasonable, but were exorbitant. The exaction of unreasonable rates by a public carrier was forbidden by the common law.[13]

The earnings, upon which Mr. Brokaw based his valuation, which were projected over a future period of 20 years, were unjust and unreasonable on the rate base fixed by the Interstate Commerce Commission. It is reasonable to assume that the Interstate Commerce Commission, either upon complaint of one of the independent shippers over the pipe line or on its own initiative, will fix rates that will produce only a reasonable return. Hence, there is no assurance that the earnings upon which Mr. Brokaw based his valuation will be enjoyed by the owners of the pipe line during its future economic life of 20 years. The reasonable assumption is that such earnings will not be enjoyed.

We are, therefore, of the opinion that it was error to arrive at the fair market value of the assets of the subsidiary on the sole criterion of the 1931 and 1932 earnings projected over the economic life of the property.

Counsel for the parent contend that replacement cost marks the upper limit beyond which a replaceable property may not be fairly valued.[14] Counsel for the

---

[10] Sumpter Valley Ry. Co. v. Commissioner, 10 B.T.A. 1325, 1327.

[11] United States v. Illinois Central R. R. Co., 263 U.S. 515, 522, 44 S.Ct. 189, 68 L.Ed. 417.

[12] 49 U.S.C.A. § 15(1); Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 385, 386, 52 S.Ct. 183, 76 L.Ed. 348; Baer Bros. Mercantile Co. v. Denver & Rio Grande R. Co., 233 U.S. 479, 487, 34 S.Ct. 641, 58 L.Ed. 1055; Diamond Tank Transport, Inc., v. United States, D.C.Wash., 23 F.Supp. 497, 501.

[13] Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 383, 52 S.Ct. 183, 76 L.Ed. 348; Interstate Commerce Commission v. Baltimore & Ohio R. Co., 145 U.S. 263, 274, 12 S.Ct. 844, 36 L.Ed. 699.

[14] See People ex rel. Delaware, L. & W. R. Co. v. Clapp, 152 N.Y. 490, 46 N.E. 842, 39 L.R.A. 237; People ex rel. Manhattan Square Beresford, Inc., v. Sexton, 284 N.Y. 145, 29 N.E.2d 654; Bonbright, Valuation of Property (1937) pp. 150–170.

Commissioner respond that a new pipe line from the Mississippi River to the eastern terminus could not be constructed without a certificate of public convenience and necessity from the Illinois Commerce Commission and that such a certificate under the circumstances would in all probability be denied.

Certificates of convenience and necessity granted by the Illinois Commerce Commission relate only to the carrying on of intrastate commerce.[15] Here, the subsidiary was engaged wholly in interstate commerce. We doubt that a certificate of convenience and necessity from the Illinois Commerce Commission to construct and operate a line across Illinois and into Indiana to engage only in carrying on interstate transportation of oil would be required.[16]

However, we do not think replacement cost marked the limit a prospective purchaser would have paid for the subsidiary's segment of the pipe line. To so regard it would be to ignore going concern and good will value and the competitive effect of two parallel lines.

But replacement cost is an important criterion, especially in the instant situation where the segment in question lies far from the productive fields and where it must depend for its traffic on its connection with the principal segment that extends to the producing fields. Therefore, while it is a criterion of value which should be considered, we do not regard it as controlling.[17]

There was evidence before the Board of sales of pipe lines extending from Texas and Oklahoma to Illinois and Indiana made eight months prior to the liquidation of the subsidiary. The sales were made at prices substantially under the cost less depreciation to the date of sale.

We are of the opinion that in the instant case, fair market value should have been arrived at upon the consideration of all available criteria, rather than solely upon the criterion of the 1931 and 1932 earnings projected over the economic life of the pipe line.[18]

Reversed and remanded with instructions to redetermine the fair market value in accordance with the views herein expressed.

HUXMAN, Circuit Judge (dissenting).

It is only where a board to whom has been delegated the duty of making a valuation acts arbitrarily or fraudulently or adopts fundamentally erroneous methods of valuation that a court may interfere. Valuing property is a difficult task. It involves the exercise of sound judgment and discretion. Where a board is created for that purpose, within the sphere of its jurisdiction, except as above noted, its judgment is as final as is that of a court of law within its jurisdiction.

We may not set aside such a judgment because of inequality or even if a mistake has been made. In Chicago G. W. Ry. v. Kendall, 266 U.S. 94, 45 S.Ct. 55, 57, 69 L.Ed. 183, Chief Justice Taft said:

"It is not enough, in these cases, that the taxing officials have merely made a mistake. It is not enough that the court, if its judgment were properly invoked, would reach a different conclusion as to the taxes imposed. There must be clear and affirmative showing that the difference is an intentional discrimination and one adopted as a practice."

This court said, in Pleasant v. Missouri-Kansas-Texas R. Co., 10 Cir., 66 F.2d 842, 845:

"Mistakes will be made, whether the valuation be made by a Commission, a jury, or a court. Courts therefore do not supervise the actions of assessing bodies, nor sit to correct their errors of judgment. Where the assessing body has failed to follow a legislative mandate, or where it has pursued a systematic course of in-

---

[15] The Texas-Empire Pipe Line Company, 11 Ill.Comm.Comm.Rep. 1671.

[16] See Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623, 38 A.L.R. 286; George W. Bush & Sons Co. v. Maloy, 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627.

[17] The Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 434, 435, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1918A, 18; Landon v. Court of Industrial Relations, D.C.

Kan., 269 F. 433, 444; Pacific Telephone & Telegraph Co. v. Whitcomb, D.C. Wash., 12 F.2d 279, 282, 283; McAlester Gas & Coke Co. v. Corporation Commission, 102 Okl. 118, 227 P. 83, 85; American Indian Oil & Gas Co. v. City of Poteau, 108 Okl. 215, 235 P. 906, 907; Boise Artesian Water Co. v. Public Utilities Commission, 40 Idaho 690, 236 P. 525, 527; Hominy Light & Gas Co. v. State, 130 Okl. 258, 267 P. 235, 237.

[18] See cases cited in Note 17, ante.

tentional discrimination, or has been guilty of fraud, or arrived at value by the use of fundamentally erroneous principles, recourse may be had to the courts. But proof of mistake or inequality is not enough."

See, also, In re State Railroad Tax Cases, 92 U.S. 575, 23 L.Ed. 663; Pittsburgh, C., C. & St. L. R. Co. v. Backus, 154 U.S. 421, 14 S.Ct. 1114, 38 L.Ed. 1031; Iowa-Des Moines Nat. Bank v. Bennett, 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265. In Chicago, B. & Q. R. Co. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 329, 51 L.Ed. 636, Justice Holmes said:

"The board was created for the purpose of using its judgment and its knowledge. [In re] State Railroad Tax Cases, 92 U.S. 575, 23 L.Ed. 663; State v. Savage, 65 Neb. 714, 768, 769, 91 N.W. 716; In re Cruger, 84 N.Y. 619, 621; San Jose Gas Co. v. January, 57 Cal. 614, 616. Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The state has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end."

There is no charge here that the Board acted arbitrarily or fraudulently. It therefore remains only to see if it employed fundamentally erroneous methods of valuation.

Where the consideration for the sale or exchange of property consists of both cash and other property, the amount realized is the cash plus the value of the property received. What we seek is the true or actual value of the property. Value cannot be established to a certainty. At best, it can only be approximated by the exercise of sound judgment. Experience has taught us that what a willing purchaser will give and a willing vendor will take comes as near to establishing the true value of property as any other criterion we can employ. No doubt that is the reason Congress adopted fair market value as the gauge by which to ascertain what we seek—true value.

Fair market value implies, however, that sales of the class of property being considered have been sufficiently numerous to establish a criterion by which to fix value. If the property under consideration is not sold on an open market or if only an occasional such sale is recorded, there is no fair market value to which we may look to establish the true value of the property under consideration. Nor can value in such case be established by opinion testimony of experts. How can even an expert offer opinion testimony as to what a willing purchaser would give and a willing vendor would take when there is no experience upon which an opinion may be bottomed? In such a case we discard fair market value and seek other methods to establish true value.

Many classes of property may be valued by the reproduction cost new less depreciation method. Ordinarily men will not pay more for property than it will cost to reproduce it. Transportation systems, such as railroads, pipe lines and telephone systems, are however not generally bought and sold on an open or free market. There is, therefore, no experience from which fair market value may be determined. Neither is the physical or reproduction cost new less depreciation necessarily a proper method to establish true value of such a property. A railroad costing $50,000,000 having a prosperous, established business, and showing healthy net profits over a number of years, certainly has a greater value than another road, just completed and costing the same amount, but having neither good will, net income, nor established business. Good will or going concern value constitutes value in addition to physical value.

Capitalized net earnings, value of stocks and bonds, are among the approved methods sanctioned in valuing utility property. Capitalizing net earnings has been approved by the Supreme Court in a number of cases as a method of establishing value. Adams Express Co. v. Ohio State Auditor, 165 U.S. 194, 17 S.Ct. 305, 41 L.Ed. 683; Louisville & Nashville R. Co. v. Greene, 244 U.S. 522, 37 S.Ct. 683, 61 L.Ed. 1291, Ann.Cas. 1917E, 97; Illinois Cent. R. Co. v. Greene, 244 U.S. 555, 37 S.Ct. 697, 61 L.Ed. 1309; Southern R. Co. v. Com. of Kentucky, 274 U.S. 76, 47 S.Ct. 542, 71 L.Ed. 934. In Chicago & N. W. R. Co. v. Eveland, 8 Cir., 13 F.2d 442, 443, Judge Sanborn said:

"In determining the value of the property of a railway company for the purposes of taxation, several classes of evidence are admissible; but the net earnings of the property and the market value of its stocks and bonds for a reasonable period antecedent to the making of the assessment con-

stitute the most reliable and influential evidence of that value."

Here we have no evidence of value of stocks and bonds to which to look, but we do have net earnings as reflected by the books of the company.

Petitioner's contention is that evaluating utility property by capitalizing net income is fundamentally erroneous. Its position is that physical value or reproduction cost new less depreciation is the only proper method to be employed in valuing its property. It rested its entire case before the Board on evidence tending to establish the physical value of the property.

The majority opinion states that the Board should have considered all available criteria rather than capitalized net income alone. Physical value is the only other criterion discussed in the opinion, unless the statement that the Board should have considered the effect of regulations by the Interstate Commerce Commission on the future earnings of the company is held to be another criterion.

Where property has intangible or going concern value, the total value is obviously greater than the physical value alone. It follows then that the physical or lesser value disappears or becomes merged in the greater one. Property possessing intangible value does not have two values, one physical and the other intangible. Neither is it necessary to consider physical and intangible value separately in evaluating such property. See Federal Power Commission and Illinois Commerce Commission v. Natural Gas Pipe Line Co. of America and Texoma Natural Gas Co., 62 S.Ct. 736, 86 L.Ed. ——, decided by the United States Supreme Court March 16, 1942. Reproduction cost need not be taken into account in weighing property that has an additional intangible value. To illustrate: How shall we value a property which has a physical value of $5,000.00, but which, on account of its net earnings, reflects a reasonable value of $10,000.00? Must we add the two values and divide by two and reach a value of $7,500.00, or use some other percentage basis? Manifestly not, because the property on the basis of net earnings is reasonably worth $10,000.00. All we can do in such case is consider both the physical value and the going concern value and then adopt the one which we consider most nearly reflects true value. That is what the Board did. It received the testimony and no doubt considered it. True, it rejected the repro-

duction cost theory of valuation in reaching its conclusion, but this it had a right to do if in its opinion it did not tend to reflect the true value of the property on account of its going concern value.

In the majority opinion, it is charged that the Board committed error because it did not take into account the effect of regulation by the Interstate Commerce Commission on future earnings. No such claim was made or advanced before the Board. No testimony was offered tending to show whether the effect of such regulation would be beneficial or detrimental to the earnings.

In reviewing a decision of the Board we may not predicate error on a ground which was not presented to the Board, nor may we make an inference of fact in conflict with the stipulations of the parties and the findings of the Board and without support in the record. General Utilities & Operating Co. v. Helvering, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154. True, the valuation found by the Interstate Commerce Commission for rate making purposes was stipulated, but that was for the purpose of establishing value and not for the purpose of showing detrimental effect from future regulation.

Moreover, I do not believe we are justified in concluding that the earnings of the past will not be enjoyed in the future. This presumption is based on the conclusion that regulation will detrimentally affect rate of return. No testimony was offered on this point. Neither does it necessarily follow that regulation will lower income. A good argument can be made as to the beneficial effects thereof where unfair competition is removed. Transportation rates for pipe line companies must have reasonable relation to the rates charged by railroads and other common carriers. It may be that the sum total of the regulation will be beneficial and add to, rather than take from, the value of the property. In any event, I do not feel that we are justified in making such a presumption in the absence of any showing in the record to sustain it.

The mandate of the court is that the Board redetermine the value by giving consideration to all available criteria; that is, physical value, effect of regulation, and capitalized net return. What does that mean? Must the Board take them all into account and reach a composite result? If so, what percent of value must be derived from each of them? Suppose the Board, upon reconsideration, reduces the value to $10,750.00.

Will we again remand and say, "You have not sufficiently considered all available criteria"? How much reduction must the Board give before we conclude it has given proper consideration to all available criteria?

Neither do I believe that the Board is required to give consideration to all available criteria. In Federal Power Commission and Illinois Commerce Commission v. Natural Gas Pipe Line Co. of America and Texoma Natural Gas Co., supra [62 S.Ct. 743, 86 L.Ed. ——], Chief Justice Stone said:

"The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas."

In a special concurring opinion, Justices Black, Douglas and Murphy interpreted the majority opinion to mean that the valuing board was now free from the compulsion of admitting evidence on reproduction cost or giving any weight to that element of fair value.

The Board properly applied an accepted and recognized standard of valuation in valuing utility property. There is no charge of fraud or arbitrary conduct, and, in my view, the decision should be affirmed.

For these reasons, I am forced respectfully to dissent from that part of the decision which strikes down the valuation made by the Board.