Vernon R. and Jessie E. BERG, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 2640.

United States District Court
W. D. Wisconsin,
Madison Division.

Oct. 30, 1958.

John Palmer Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., for plaintiffs.

David W. Richter, Tax Department, Andrew D. Sharpe, Chief, Trial Section, Tax Department, Washington, D. C., George E. Rapp, U. S. Atty., Madison, Wis., for defendant.

TEHAN, District Judge.

The plaintiffs herein, residents of Marshfield, Wisconsin, commenced this action for the recovery of income taxes and interest assessed and collected for the calendar year 1950 in the sum of $53,346.57. Concededly, jurisdiction is conferred upon this court by the provisions of Section 1346(a) (1), 28 U.S.C., as amended in July, 1954. The stipulation of facts filed herein reveals the existence of the following uncontroverted facts:

1. Plaintiffs are citizens of the United States and of the State of Wisconsin, and

have, at all times material to this action, resided at 413 Park Avenue, in the City of Marshfield, County of Wood, in the Western District of Wisconsin.

2. Plaintiffs duly and timely filed their joint federal income tax return for the calendar year 1950 and duly and timely paid income tax thereon in the amount of $131,772.78 to the Collector of Internal Revenue at Milwaukee, Wisconsin.

3. Under letter dated May 11, 1954, the Commissioner of Internal Revenue issued to plaintiffs a statutory notice of deficiency in income taxes for the year 1950 in the total principal amount of $31,690.-90, which amount, together with interest thereon of $6,048.25, was duly paid by plaintiffs to the Collector of Internal Revenue on May 20, 1954, and June 8, 1954.

4. Said deficiency and interest were assessed on August 2, 1954, and on August 3, 1954, plaintiffs timely filed their claim for refund duly made and executed, for the taxable year 1950, claiming refund of income taxes and interest in the amount of $53,346.57, or such greater amount as may be legally refundable, plus interest thereon.

5. The Commissioner of Internal Revenue notified the plaintiffs by registered letter dated October 15, 1954, that said claim for refund was disallowed in full.

6. At the time of liquidation thereof on March 31, 1950, the plaintiffs owned 100 per cent of the outstanding stock in each of two Wisconsin corporations, viz., Berg Equipment Corporation and Simplex, Inc. Said corporations were engaged in the business of manufacturing, assembling and selling farm and barn equipment, such as cattle stanchions, barn partitions, barn ventilators, etc. Said corporations each made distributions to the plaintiffs in complete liquidation of their stock on March 31, 1950. Thereafter, said corporations were caused to be duly dissolved pursuant to applicable provisions of the Wisconsin Statutes.

7. Immediately upon receiving the aforesaid distributions in liquidations, plaintiffs formed a partnership, Berg Equipment Company, in which each held and continues to hold a 50 per cent interest. With the exception of certain items of inventory valued at not more than $1,000, all of the inventory assets received by plaintiffs from the aforesaid liquidations were transferred and contributed by them to said partnership, which began business operations on April 1, 1950. The type of business conducted by said partnership has at all times been identical to that formerly conducted by the dissolved corporations, Berg Equipment Corporation and Simplex, Inc.

8. Berg Equipment Company, the partnership, at all times material to this proceeding, inventoried its goods under the "lower of cost or market" method. In practice, however, cost was normally used for inventory basis, without reference to market. The values thereby determined are hereinafter referred to as "book values."

9. Plaintiff's computation of fair market values of its inventory was arrived at by first attributing to each item a value equal to the catalogue list price thereof in the case of finished goods and a value equal to cost or book value with respect to raw materials or semi-finished items. From the tentative values thus computed for finished items, plaintiff subtracted its customary 20 per cent dealer discount, and then from the value of all items (finished, semi-finished and raw materials), it subtracted its historical 10 per cent selling and marketing expense. Thus computed, the value of plaintiff's inventory which was acquired on April 1, 1950, by Berg Equipment Company totaled not less than $267,390.87. Therefore, the opening inventory on the books of Berg Equipment Company would properly be not less than $267,390.87 if the fair market value of said inventory items is to be determined under plaintiff's method of computation and valuation as described above. If plaintiff's method of

valuation as set forth above is the proper method to be used, the figures and percentages adopted by plaintiff in arriving at such valuation are true and correct and are as of March 31, 1950.

10. The total book value of said inventory items was $152,050.09, as of March 31, 1950. The raw material costs, labor and burden costs included in said figure would not have been greater than $152,050.09 if raw materials had been purchased on March 31, 1950, and labor and burden rates actually in effect on March 31, 1950, had been utilized.

11. As of March 31, 1950, a substantial amount of the inventory items here involved were on order by customers at catalogue list prices, and the balance thereof were sold to customers prior to September 30, 1950, at prices no less than December 15, 1949, catalogue list prices, except for the discounts hereinafter described in paragraph 16.

12. As of March 31, 1950, $42,175.80 of the inventory items here involved were attributed a fair market value equal to book value.

13. All of finished goods inventory items were, as of March 31, 1950, of marketable quality and substantially all thereof were ready for shipment to customers.

14. Plaintiff's selling and marketing expense for its inventory was not in excess of 10 per cent during the period January 1, 1950, to September 30, 1950, inclusive.

15. Each item of inventory included in Berg Equipment Company's opening April 1, 1950, stock of goods bore a Berg trade name or Berg model number, except for stock items such as nuts and bolts, etc.

16. All items of inventory of Berg Equipment Company, which were sold prior to September 30, 1950, were sold at the following prices: Direct sales to farmers: not less than catalogue price per the December 15, 1949, price list, except that in sales involving substantial amounts, discounts were sometimes made, amounting to approximately 10 per cent; sales through authorized Berg Equipment Company dealers: not less than catalogue list price per the December 15, 1949, price list, less the customary 20 per cent dealer discount.

17. Effective as of April 1, 1950, Berg Equipment Company revised its catalogue list prices upward at various percentages varying from 10 per cent to 20 per cent per item. The catalogue list prices used as the basis for computing the figure of $267,390.87 were from the December 15, 1949, price list (in effect on March 31, 1950), which quoted prices ranging from 10 per cent to 20 per cent lower per item than the April 1, 1950, price list.

18. The Berg Equipment Company's ordinary net income from business operations during the period April 1, 1950, to September 30, 1950, totaled $81,775.38, per the partnership federal income tax return. The partnership ordinary net income for said period per the statutory notice of deficiency dated May 11, 1954, totaled $152,775.38.

19. The opening inventory on the partnership books would properly be $267,390.87 if the fair market value of said inventory items is to be determined in accordance with plaintiff's method of valuation described in paragraph 9. If the fair market value of said inventory items is determined to be equivalent to replacement cost or books value, said opening inventory would be $152,050.09.

Upon the pleadings and said stipulation, the defendant, United States of America, moved for summary judgment as a matter of law against the plaintiffs and in favor of the defendant. The plaintiffs answered praying that the motion be denied on the grounds that there was a triable issue as to material facts and in the alternative for summary judgment in their own favor and against the defendant.

On such motion and now the parties are in agreement that the following statutes are involved:

Internal Revenue Code of 1939:

"§ 111. Determination of amount of, and recognition of, gain or loss.

\* \* \* \* \* \*

"(b) *Amount realized.* The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." 26 U.S.C. 1952 ed., § 111.

"§ 112. Recognition of gain or loss.—

"(a) *General Rule.* Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section." 26 U.S.C. 1952 ed., § 112.

"§ 115. Distributions by corporations.

\* \* \* \* \* \*

"(c) *Distributions in liquidation.* Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112." 26 U.S.C. 1952 ed., § 115.

After hearing arguments and considering the briefs filed this court being of the opinion that there was a genuine issue of material fact and that defendant was not entitled to a judgment as a matter of law denied the defendant's motion and set the matter down for trial.

Upon the trial of the case the plaintiffs offered the evidence, oral and documentary, of the plaintiff, Vernon R. Berg, and four expert witnesses. The Government contented itself with cross-examination and the testimony of the Revenue Agent who had recommended the deficiency assessment.

Since the Government made no effort to controvert them, we are able to find the following facts in addition to those stipulated to heretofore:

Vernon R. Berg started in the business of dealing in, assembling and manufacturing dairy and barn equipment in 1919 as the Berg Equipment Corporation. In 1938 he and his wife acquired all the stock in Simplex, Inc., a competitor in the field.

At the times significant here, the Berg Equipment Corporation had ten men in its factory, five salesmen and one hundred sixty-eight dealers, who were in the main barn builders, cement men, and contractors who carried the Berg line exclusively. The operations of the business were decidedly seasonal since the installations could only be put in when the weather permitted the cattle to be out of the barns for substantial periods. Orders for Berg equipment usually began with a report from one of the dealers that he had a barn prospect. A salesman, who was really a barn building engineer, would then accompany the dealer to the prospect and draw a blueprint to sketch the equipment needed and estimate the cost thereof. The contractor dealer would then make his estimation of the amount of concrete, lumber and other material needed, and submit a price. Each estimate, however, was a separate transaction. If the farmer accepted the contract, the necessary equipment was shipped to the site. There it was installed by the contractor, under the contractor contract. Over 90% of Berg business was in the complete barn job end. There was some business in replacement parts, since the Berg equipment was unique and only Berg parts would fit.

Simplex, Inc., had two hundred thirty-four dealers, but they were mostly hardware and implement dealers who handled a variety of products and lines. The plaintiffs had bought Simplex and operated it with the purpose in mind, of removing a competitor, retaining all its good will and at the same time making it

subordinate to Berg and over the years letting it be absorbed by Berg.

On March 31, 1950, the selling prospects were very good. There was a lot of barn building that season and the company had more proposals than ever before. Good reason existed for plaintiff Vernon Berg's belief that the entire inventory would be sold within sixty to ninety days at the suggested retail price less 20%, or a sum of $268,390.87, as actually proved to be the fact. The company had at that time decided to raise its catalogue prices 10% to 20% as of April 1, 1950, and did so on all goods except those furnished in fulfillment of contracts based on 1949–1950 price list.

While only 15% of the inventory on hand was actually manufactured in the Berg plant, the remainder was made to Berg specifications and with Berg patterns and dies and all the inventory was painted and stamped at the Berg plant. All castings were made from plaintiffs' special patterns and in many cases bar and sheet steel was special. Had a catastrophe occurred on March 31, 1950, wiping out the Berg inventory, it appears that it would have taken six months to replace that inventory since there was no available resource to purchase a similar stock of finished goods.

The book cost of the inventory items as of March 31, 1950, appearing as $152,050.09 did not include any values resulting from good and intelligent buying of raw materials or values added because of organizing material, cost of administrative overhead, salesmen's salaries, advertising, catalogue costs, value of good engineering and design, executive direction or value of a well-balanced inventory.

As of March 31, 1950, said inventory consisted of (a) raw materials and semi-finished goods; (b) completed units; and (c) finished goods saleable individually. The plaintiffs computed the fair market values or net realizable values of each of said categories as follows:

| | Gross Catalogue Selling Price | 20% Dealer Discount | Net Dealer Price | 10% Selling Expense | Fair Market Value |
|---|---|---|---|---|---|
| (a) | $ 42,175.80 | — | $ 42,175.80 | $ 4,217.58 | $ 37,958.22 |
| (b) | 168,419.90 | $33,683.98 | 134,735.92 | 13,473.59 | 121,262.33 |
| (c) | 151,625.44 | 30,325.09 | 121,300.35 | 12,130.03 | 109,170.32 |
| | $362,221.14 | $64,009.07 | $298,212.07 | $29,821.20 | $268,390.87 |

(Plaintiffs' Exhibit 1.)

The liquidations of the corporations were not motivated by any design to minimize taxes, but resulted because of sound business reasons and a desire to satisfy objections of its local Internal Revenue agent on the dual corporate operation of what he considered the same single business.

Further facts, especially those resulting from the opinion testimony of expert witnesses, will be found in the following opinion of the court.

At the outset it can be stated that the parties are agreed on these fundamental principles:

(1) Under the applicable statutes the taxpayers are entitled to use fair market value of the inventories at the time of liquidation in determining their gain or loss on the liquidation and that such value becomes the value of the opening inventory of the partnership to the extent of inventory contribution.

(2) Fair market value is the price a willing buyer will pay a willing seller, both having full knowledge of all the facts and neither being under any compulsion to buy or sell.

(3) The Internal Revenue Commissioner's interpretation and determination

of fair market value of the Berg inventory is *"prima facie"* correct.

The plaintiffs herein willingly assumed the burden of overcoming the presumptive correctness of the Commissioner's determination and of proving it to be wrong. In addition to adducing the evidence from which this court has made the findings of fact heretofore set forth the plaintiffs called in their behalf four expert witnesses: Leonard B. Krueger, the City Assessor of Madison, Wisconsin, who testified to having been a tax analyst, appraiser, a federal and state tax official, and a teacher in the fields of accounting, statistics, economic geography, monetary theory and business cycles; P. W. McCurdy, a certified public accountant, with many years of experience as a specialist in tax accounting, and who was an accountant for the plaintiffs' corporations; Harry J. Miller, a certified public accountant in public accounting work since 1941; and William Surles, Vice-President of the Fidelity Appraisal Company, who testified to his having at least ten or eleven years' experience in appraisal work. The defendant has not seriously challenged the qualifications of the plaintiffs' four expert witnesses in their respective fields of competency, and we are of the opinion that they were competent to give their opinions of the "fair market value" of the inventory involved herein.

Mr. P. W. McCurdy, a certified public accountant, testified that the net realizable value of said inventory as of March 31, 1950, was not less than $268,390.87. Mr. McCurdy is an experienced certified public accountant and the determination of net realizable values is a technique which is within the field of accounting.

Mr. Harry J. Miller, a certified public accountant and partner in charge of the Milwaukee office of Peat, Marwick, Mitchell & Company, testified that the net realizable value of the inventory here in issue was not less than $268,390.87, and that book cost bears no relationship to net realizable value.

Mr. William Surles, the Vice-President of Fidelity Appraisal Company, testified

that plaintiffs' method of arriving at the fair market value of this inventory is in accordance with accepted methods and principles of appraisal, and in his opinion the fair market value of this inventory was at least $268,390.87, and probably more as there is some doubt as to the validity of reducing fair market value by reason of dealer discounts or estimated selling expenses. He further testified that in this case the only acceptable method of appraising fair market value is to determine the best use and best market for the goods and the amount which the item actually sells for in its normal market. Book costs or replacement costs have little or nothing to do with fair market value where there is a ready market for disposal of the goods at known prices.

Mr. Leonard B. Krueger, a Ph. D. in Economics and City Assessor of the City of Madison, considered the fair market value of the inventory in question as of March 31, 1950, to be at least $268,390.87, because the goods could have been and were sold in the usual course of business at catalogue list prices and all sales from December 15, 1949, to approximately July 1, 1950, were at catalogue list prices and the expense of realizing catalogue list price was readily determinable. He testified that as of March 31, 1950, the beginning of plaintiffs' selling season, the inventory had a "time, place and form utility," which means that an orderly, balanced, well-engineered stock of goods which is ready to be placed instantly on the market has an inherent value which bears no relationship to its book cost.

To meet the case so established by the plaintiffs, the defendant called one witness, the Internal Revenue agent, H. C. Nordling, upon whose examination and recommendation the deficiencies involved herein were made in 1954. Mr. Nordling, who joined the Internal Revenue Service in 1950, and became a certified public accountant in 1953, did not persuade us as to the reason and sense of taking his rigid position. He testified as to how he determined the value of the inventories and what he found them to be, to wit, not in excess of $152,000. His basis for his

determination of market value and the assessment of the deficiencies was what he described as "replacement costs". He claimed that the replacement cost method was justified because in his opinion 85% of the inventory items were readily replaceable, since no manufacturing operations had been performed by the Berg corporations on them. His premise in this respect is, of course, at variance with our finding heretofore made that while only 15% of the inventory on hand was actually manufactured in the Berg plant, the remainder was made to Berg specifications and with Berg patterns and dies and all the inventory was painted and stamped at the Berg plant, that all castings were made from plaintiffs' special patterns and in many cases bar and sheet steel was special, and that had a catastrophe occurred on March 31, 1950, wiping out the Berg inventory, it appears that it would have taken six months to replace that inventory since there was no available resource to purchase a similar stock of finished goods. He also stated that replacement cost was an "upper limit" criterion but gave no basis for such proposition. Nowhere in the entire record of these proceedings did the witness Nordling, nor the defendant, provide any support in reason or law for rigidly precluding the use of all available methods of testing fair market valuation except one—replacement cost.

While this Court recognizes replacement cost, replacement value or reproduction cost as *a* basis of inventory valuation, as do other courts (see Neusteter Suit Co. v. Commissioner, 1927, 8 B.T.A. 477), it is of the opinion that it cannot do so to the exclusion of other sensible and valid methods of valuation.

It is the opinion of this court that fair market value of assets should be determined and computed upon a consideration of all available and valid criteria and that replacement cost, although a relevant criterion if properly and sufficiently proved, cannot be used to the exclusion of other methods nor does it mark the upper limits of proper valuation. See Texas-Empire Pipe Line Co. v. Commissioner of Internal Revenue, 10 Cir., 1942, 127 F.2d 220, 225–226; Id., 10 Cir., 1944, 141 F.2d 326.

As a matter of fact, this court does not believe that the defendant has established here such a case of replacement value as would entitle it to weight as even one of the relevant criteria to be used in testing fair market value. It is true that the stipulation of the parties provides:

"The total book value of said inventory items was $152,050.09 as of March 31, 1950. The raw material costs, labor and burden costs included in said figures would not have been greater than $152,050.09 if raw materials had been purchased on March 31, 1950, and labor and burden rates actually in effect on March 31, 1950, had been utilized."

But in this respect it should be observed that it is not stipulated that there was a ready replacement market for finished goods or raw material. In fact, the plaintiffs have proved to the contrary, that is, that the goods were unique, the raw steel difficult to obtain, and that at least six months would be required to replace the inventory. Such a six-month period of non-productivity in this seasonal business would result practically in the loss of a whole year's business.

Under the circumstances of this case replacement value has no validity or weight as one of the criteria of fair market value in the absence of proof of a ready and available replacement market. While the stipulation in this case goes a bit further than agreement on book value, what Judge Duffy said in Ketler v. Commissioner of Internal Revenue, 7 Cir., 1952, 196 F.2d 822, 827, is apposite:

"It is quite evident that the book value of a stock is a very unreliable basis upon which to determine the fair market value. 'Book value frequently bears no relationship to actual cash value or fair market value.' Anson Evans, 29 B.T.A. 710; Mertens, Sec. 9.87 and 59.14. In Commissioner of Internal Revenue v. McCann, 2 Cir., 146 F.2d 385, 386, the

court said: 'All we decide is that it was, as matter of law, erroneous to refuse to consider any other factor than the book value at the time of the gift; * * *.' "

We see no escape from the conclusion that the presumption that the Commissioner's determination that the fair market value of the inventory was $152,050.-09 has not only been overcome by the proofs adduced by the plaintiffs but that it is clearly erroneous as being without support in fact or in law.

We are confident that had these transactions been simple corporate liquidations, without continued operation of business under the form of a partnership, the Government itself would be urging upon this court the use of the very criteria here urged by the plaintiffs, to wit, the excellent sales prospects, the substantial firm orders already in, the unprecedented manifestation of interest in buying by farmers in the form of contract proposals, the rising market which justified an immediate ten to twenty per cent raise in prices, and the fact that there was good reason to believe that all of the inventory could be sold within three months and delivered in six, as it was.

We conclude that the proper method of determining fair market value of the inventory in issue in this case as of March 31, 1950, is to value said inventory at the price for which it could be sold by plaintiffs over the next several months less the necessary costs of disposition. We further conclude on the basis of all of the evidence that the fair market value as of March 31, 1950, of the inventory items received by plaintiffs in exchange for all of their stock in Berg Equipment Corporation and Simplex, Inc., was not less than $268,-390.87. We further conclude that after removing inventory having a fair market value of not more than $1,000, the inventory contributed by the plaintiffs to Berg Equipment Company as of April 1, 1950, had a fair market value of not less than $267,390.87, and said figure represents the proper opening inventory on the books of the partnership. The court further concludes that the plaintiffs are entitled to a refund in income taxes and interest for the taxable year 1950, which were illegally assessed and collected, totalling $53,346.57, together with interest from the date of payment thereof, according to law, with the costs and disbursements of this action.

The foregoing Opinion shall stand as and for findings of fact and conclusions of law within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C. Counsel shall draft an order for judgment, and a judgment, submitting them to opposing counsel for approval as to form and computation.