Peavey Paper Mills (Inc.) v. Commissioner.
Peavey Paper Mills (Inc.) v. Commissioner
Docket No. 78859.
United States Tax Court
T.C. Memo 1960-237; 1960 Tax Ct. Memo LEXIS 53; 19 T.C.M. (CCH) 1325; T.C.M. (RIA) 60237; November 4, 1960
*53 Held: That respondent has failed to prove that the fair market value of 147 of petitioner's 300 authorized shares was, on July 16, 1951, worth less than the stated contract price for such shares. Respondent has therefore not proved the applicability of section 275(c), I.R.C. 1939, and the year 1951 is thus barred by the statute of limitations. John S. Best, Esq., 110 E. Wisconsin Ave., Ladysmith, Wis., and Richard D. Hobbet, Esq., for the petitioner. Delman H. Eure, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in income tax of the petitioner as follows: Year
Tax
Deficiency
1951
Income
$355,761.96
The issues presented are as follows: 1. Whether a part of the contract price paid to petitioner's minority shareholder for his stock constituted additional consideration for petitioner's production and sale of newsprint, which is taxable income to the petitioner for 1951. 2. Whether assessment of the deficiency is barred by the statute of limitations or is permissible under section 275(c) of the Code of 1939. Findings of Fact Some of the facts are stipulated *54 and are incorporated herein by this reference. Peavey Paper Mills (Inc.), hereafter referred to as petitioner, is a Wisconsin corporation engaged in the business of manufacturing paper and paper products, with its principal office and place of business at Ladysmith, Wisconsin. It filed a U.S. Corporation Income Tax Return with the then collector of internal revenue, Milwaukee, Wisconsin, for the calendar year 1951. William M. Peavey, hereafter referred to as William, now deceased, and Harold J. Peavey, hereafter referred to as Harold, were brothers who organized petitioner. The plant and property now occupied by petitioner, and occupied during 1951, were acquired in 1933. At that time the plant had been idle for several years and was purchased by the issuance of $50,000 of petitioner's bonds. William was approximately ten years older than Harold and prior to July 1951 had been petitioner's president and general manager. William was of the opinion that a small marginal mill, such as petitioner, could not compete successfully against the large paper producers. William was personally interested in raising and racing horses and wished to move away from Ladysmith. He owned a stable *55 of horses for a number of years and devoted much of his time to following the races, including a three months trip to Florida each winter. Harold began in petitioner's sales department and subsequently became sales manager. William and Harold had many disputes over the general policy of operating and managing the company. Fundamentally, these concerned Harold's desire to build for the future of the company and William's desire to concentrate on the short term. One of the serious disputes which William and Harold had was related to the sales policy of the company. Harold fought for many years to start selling directly to wholesale grocers instead of to paper jobbers. This disagreement spanned a period from 1935 to 1942, when Harold took it into his own hands to order an immediate change in sales policy while William was on his annual trip to Florida. By the time William returned, the transition had been made irrevocable. William reacted to this by refusing to permit petitioner to spend money maintaining or improving the mill. Another disagreement involved the purchasing of sulphite pulp, a raw material. William preferred to buy in the spot market and was opposed to any long-term *56 contracts proposed by Harold who wished to assure a steady supply. This difference of interest and business policy and philosophy which existed between William and Harold caused continuing disputes and adversely affected petitioner's business from 1942 through 1951. Prior to 1946 petitioner's principal product was sanitary tissue. Its equipment was also adaptable to the production of newsprint, but the corporation was not equipped to compete on a long-range basis in the manufacture of newsprint. Operating continually on a 24-hour basis, petitioner could produce about 42 tons of newsprint per day, which was its 1951 average. Converting its machines from production of tissue to newsprint and vice versa is a complicated and time consuming process. Canadian mills are the principal supplier of newsprint to United States newspaper publishers. There is no customs duty on the importation of newsprint from Canada. Most Canadian newsprint is sold under long-term contracts of from 3 to 15 years. A paper mill the size and character of petitioner, described as a marginal mill, cannot profitably produce and sell solely newsprint in competition with Canadian mills except in times of extreme *57 shortages as may be generated by national emergency. During the years 1946 to 1953, inclusive, there was a shortage of newsprint in the United States. The Journal Company publishes The Milwaukee Journal, and operates radio and television stations. In September of 1946 the Journal Company acquired a 40 per cent interest in petitioner by purchasing all of the stock of its minority stockholders and 50 shares each of the stock of William and Harold. This was a total of 200 of 500 shares outstanding at that time. Also, in 1946, petitioner contracted to produce and sell newsprint to the Journal Company. The contract provided for the delivery of 6,000 tons per year for a period of three years. The contract for the production and sale of newsprint was executed by petitioner "in return for" the Journal Company's purchase of the Peavey stock. During the period 1946 to 1949, inclusive, petitioner's production of tissue and newsprint was as follows: Year
Tissue
Newsprint
1946
7,135
432 (begun in September)
1947
4,802
6,039
1948
5,106
5,595
1949
4,499
3,197 (ended in June)
During 1950, petitioner, by William and Harold, and the Journal Company conducted negotiations *58 regarding the purchase of petitioner's stock held by the Jounral Company. In the course of these negotiations on July 21, 1950, William sent a letter to the Journal Company, which stated in part: * * *
I have one further thought in connection with the Journal and that is I think the Journal at all times has over-estimated the value of their minority interest in this company and I, at least, would like to see them make some effort to sell it to someone else. I believe then that you would come to a truer understanding of what you own. To make the record complete for both of us, we request that the Journal tell us what you will take for this stock. This you have never done. * * * Subsequently in 1950 the Journal Company sold its 200 shares of petitioner's stock to petitioner for $1,000 per share. This stock was retired by petitioner, there being a feeling that this was the first step in William's leaving petitioner. Thereafter, and until July 16, 1951, petitioner's outstanding capital stock consisted of 300 shares of common held as follows: Number
Name of Shareholder
of Shares
William M. Peavey
95
Irma A. Peavey (wife of William)
35
Marjorie Peavey Breeding (daughter
of William and Irma)
10
William B. Peavey (son of William
and Irma)
10
Harold J. Peavey
120
Drusilla E. Peavey (wife of Harold)
10
Virginia Peavey Arndt (daughter of
Harold and Drusilla)
5
Helen Peavey Bungi (daughter of
Harold and Drusilla)
5
Harold L. Peavey (son of Harold and
Drusilla)
5
Charles Robert Peavey (son of Harold
and Drusilla)
5
Total
300
*59 On November 29, 1950, petitioner and the Journal Company executed a contract for the sale of newsprint providing for the sale of 1,500 tons, 500 of which were to be delivered during December 1950, and the balance in approximately equal monthly installments during the ensuing 11 months. The selling price of the newsprint under the Journal Company contract was $170 per ton, f.o.b. Ladysmith. All costs for the transportation of newsprint to Milwaukee were to be borne by petitioner. The cost of shipping newsprint from Ladysmith to Milwaukee was $5.40 per ton prior to August 28, 1951, and $5.72 per ton thereafter. In January of 1951, petitioner made a spot sale of 2.95 tons of newsprint to the Superior Telegram, Superior, Wisconsin, at $170 per ton, f.o.b. Ladysmith. In June 1951, it made a spot sale of 4.8 tons to the Superior Telegram at $150 per ton, f.o.b. Ladysmith. In April or May of 1951, petitioner sold 447.76 tons of newsprint to the Kansas City Star at $135 per ton, freight allowed to Kansas City. The freight rate to Kansas City is approximately $12 per ton, which resulted in a delivered price of about $147. This was part of an arrangement which enabled petitioner to obtain *60 a quantity of unbleached sulphite from Flambeau, a company owned by the Star. The Kansas City Star made the following spot purchases of newsprint during the year 1951 at prices delivered in Kansas City: Price
Seller
Tons
Per Ton
Mead Sales
160.38
$173.72
Petitioner
447.76
147.15
Combined Locks
1,373.09
148.77
International Paper Co.
777.08
141.86
Boston Herald
48.71
142.43
By late 1950 or the early part of 1951, William had completely lost interest in petitioner and had definitely decided to dispose of his stock in any way possible. Unknown to Harold, it was listed with brokerage and investment firms in Wausau and Milwaukee, and Minneapolis, Minnesota. William also employed a man named Allen Kander to sell the stock. By this time Harold had come to the conclusion that it was in the best interests of petitioner that William withdraw from the company. Harold considered the possibility of buying William's stock, but did not have the necessary funds. Harold wished to remain with petitioner and had no interest in selling out. Harold's son, Harold L. Peavey, had begun to work for petitioner in 1950. In 1951, there was a critical shortage of *61 newsprint. Newsprint mills in North America were operating at more than 100 per cent of their rated capacity and still could not fulfill the demand for newsprint. This demand was stimulated in part by the large growth in newspaper advertising and also by the increase in space devoted to news occasioned by the Korean War. It takes at least two years to build a paper mill. During World War II governmental controls on new construction prevented any sizeable increase in papermaking capacity. In the post war period it was impossible to build newsprint capacity fast enough to keep pace with demand. Capacity did not catch up to demand until 1955. As a consequence, publishers sought and obtained additional newsprint by (1) spot purchases; (2) inducing mills then producing other paper products to convert to newsprint; and (3) buying control of mills and converting them to newsprint. A spot sale of newsprint generally involves a sale of existing newsprint or newsprint which will be manufactured in the near future for immediate delivery at a fixed price. It does not involve a long-term contract commitment. It is generally made by or through a broker. There was no established market price *62 for spot newsprint in 1951; prices varied over a wide range of from $150 to $300 per ton, depending upon the particular circumstances of the sale. Approximately five per cent of the newsprint consumed in the United States in the year 1951 was purchased on a spot basis. The balance was sold under contract commitments. There is a regularly established contract price for which most large mills sell their newsprint. This price is published and widely known. It is established through price leadership. During the year 1951 the Government Printing Office purchased 7,559 tons of newsprint. It advertised for its estimated requirements on a quarterly basis, but no bids for newsprint were received at any period during that year in response to the invitations. The Government paid prices ranging from $101 to $182 per ton during 1951. Less than one per cent of the Government's purchases of newsprint were for prices in excess of $143 per ton. The Government purchased no newsprint during the year 1951, prior to November 26, at a price higher than $130 per ton. During 1951 there was also an acute shortage of sulphite pulp, a necessary raw material in the manufacture of paper. Excluding water, *63 sulphite pulp constitutes approximately 50 per cent of the ingredients used in producing tissue. Bleached sulphite is normally used in producing tissue, but, if not available, unbleached sulphite may be substituted. Unbleached sulphite is used in making newsprint. Petitioner had a contract with Great Lakes Paper Company which had originally called for delivery of 200 tons of unbleached sulphite pulp to petitioner each month during the year 1946, and 260 tons per month during the years 1947 to 1953, inclusive. Petitioner had to curtail its production in 1949, and therefore breached this contract, accepting shipments averaging only about 150 tons per month during 1950 and the first half of 1951. When the Korean War began in June 1950, petitioner immediately asked Great Lakes to reinstate deliveries of the full 260 tons of sulphite pulp per month, but it refused to do so. Because of petitioner's shortage of sulphite pulp, at various times during the first half of the year 1951, it was necessary to shut down one or both of its two paper machines. John Gefaell was vice president and sales manager of Great Lakes Paper Company, Ltd., a Canadian corporation, engaged in the manufacture *64 of newsprint and unbleached sulphite. His assistant in that capacity was J. Harrison Gefaell, his son. In 1951 J. Harrison Gefaell, hereinafter called Gefaell, and his brother, Robert, were partners in Pulpaper Company, commission brokers of newsprint. George J. Cooper is an attorney, who, during 1951, was engaged in the sale of newsprint, sulphite plup, and paper products. He represented Pulpaper and Gefaell. Pulpaper was in a position to assure petitioner a supply of sulphite pulp from Great Lakes Paper Company in 1951 but it wanted to obtain newsprint from petitioner to resell or sell on a commission basis. Between December 1951 and April 1951, Pulpaper contacted petitioner offering to obtain a supply of sulphite pulp for petitioner if it would agree to manufacture newsprint for sale to or by Pulpaper. William was unwilling to commit petitioner to long-term contractual obligations. He caused petitioner to reject the offer to make newsprint in exchange for a supply of sulphite pulp. Harold felt that it would be desirable for petitioner to enter into a long-term newsprint contract if this would assure it a long-term supply of good quality sulphite pulp. Petitioner made many attempts *65 in 1951 to get sulphite pulp from sources other than Great Lakes. Northwest Publications, Inc., is a corporation which publishes newspapers in Minnesota. Two of the newspapers published by Northwest are the St. Paul Dispatch and the St. Paul Pioneer Press. Daniel H. Ridder was business manager of the St. Paul Dispatch in 1951. Along with others, he was involved in purchasing newsprint. RidderPublications owns approximately 70 per cent of the stock of Northwest Publications. It also owns stock in other newspaper publishing companies in California. Northwest Publications received its regular supply of newsprint from the Abitibi Power and Paper Company, a Canadian producer, under a contract or renewals of a contract executed in 1940. During 1951 Abitibi was unable to deliver the newsprint contracted for and Northwest Publications' demands exceeded the amount contracted for. Northwest Publications was unable to obtain sufficient newsprint to publish all of the advertising it felt available and desirable. Northwest and RidderPublications are hereafter referred to as the Ridder group. In the first part of 1951 Allen Kander and another man, hereafter referred to as "B," presented *66 to Cooper and Pulpaper, a proposal concerning the sale of petitioner's stock and the manufacture of newsprint by petitioner. This proposal was outlined by Cooper signing for Pulpaper Company in a letter dated June 19, 1951, to RidderPublications. It had previously been discussed in a telephone conversation. The letter provided the following terms: Beginning in July 1951, 6,000 tons of newsprint would be manufactured during each of the first two years, and 4,000 tons the third year. The owner of 49 per cent of petitioner's stock would sell his shares to a corporation which would then lease one of petitioner's machines. Petitioner would supply materials and labor and charge a rental $142of per ton. The corporation would sell the lease to one or more publishers for $960,000 in January 1952, with a $180,000 escrow payment being made in July 1951, when production would begin. The corporation would receive the escrow money in January 1952, less $60 for each ton under 3,000 delivered which was to be returned to the publishers. A second escrow payment and further installment payments would take place until July 1953, in each case the publishers receiving a rebate of $60 per ton for contracted *67 tonnage which was not delivered. The net result was that the publishers would have paid $960,000 for the lease for 16,000 tons ( $60 per ton), and $142 per ton for machine rental, or a total price of $202 per ton f.o.b. the mill, which the letter stated "can all be written off as a cost of obtaining newsprint." The $142 price was subject to increases or decreases in the cost of manufacture. The publishers were to allocate the newsprint inter sese. This letter requested a response to the proposal within a week so that a meeting could be arranged. The proposal was also made to a number of other publishers in telephone conversations and personal visits. The proposed lease arrangement was rejected by either the publishers or the Peaveys, or both. The parties were, however, interested in a transaction which would involve the sale of William's stock and petitioner's production of newsprint. Cooper and Gefaell arranged a meeting in Chicago to discuss the entire matter. Harold learned of the meeting from Gefaell. At this meeting in June or July of 1951, which was the first of two meetings in Chicago, William and Harold met Kander and "B." The meeting lasted for two or three days *68 and was taken up almost entirely with negotiations by William for the sale of his stock. The only part that Harold played was that he was asked if petitioner would be willing to make newsprint if "B" acquired William's stock. Harold indicated that it could be arranged. Harold had authorized such presentation only to the extent of letting Pulpaper Company know that if it would give petitioner a sulphite contract Harold would be agreeable to having petitioner enter into some type of newsprint contract. Pulpaper had been interested in what kind of a price petitioner would place on its newsprint and the figure of $140 plus had been generally discussed. Harold first learned of the proposed leasing arrangement at the first meeting in Chicago when "B" and Kander were present. The first meeting in Chicago resulted in a contract satisfactory to William being negotiated, under which his stock was to be sold to "B." A contract was actually drawn up and signed by William and "B," but it was discovered by William's attorney that "B" had not signed his own name to the agreement. William was angry at this development and tore up the contract. Under this contract William's stock was to be sold *69 for a price of $925,000. This abortive attempt at reaching an agreement caused dissension between Kander and the Peaveys, and tension between William and Harold. Gefaell assisted in preparing the parties for further negotiations. A second meeting was then arranged in Chicago at which the representatives of four publishers were present. Cooper had contacted the four publishing companies and arranged that they get together. It had been explained to them that they would have to pay a spot price for the newsprint. The four publishing concerns represented were: 1. The Ridder group. 2. Globe-Democrat Publishing Company 3. McClatchy Newspapers 4. Copley Press, Inc.
McClatchy Newspapers, Inc., publishes newspapers in California. These papers include the Sacramento Bee, Modesto Bee, and Fresno Bee. In 1951 John T. Hamlyn was counsel of McClatchy and assisted in its acquisition of newsprint. McClatchy's principal supplier of newsprint was a Canadian concern. During 1951 the newsprint shortage forced McClatchy to purchase newsprint from other sources at spot prices ranging from $150 to $300 per ton. Globe-Democrat Publishing Co. publishes a newspaper in St. Louis, Missouri, *70 The Globe-Democrat. C. A. Weis was first vice-president, treasurer, and a director of Globe-Democrat in 1951. He and another officer were responsible for assuring the Globe-Democrat of its supply of newsprint. In 1951 Globe-Democrat's principal supplier of newsprint was Abitibi Power and Paper Company. During that time Abitibi did not deliver all of the newsprint contracted for with the Globe-Democrat. In 1951 the newsprint shortage seriously restricted the Globe-Democrat's business activity. It was unable to accept all advertising available to it and could not print all that was accepted. This situation was severely aggravated when one of its competitor newspapers purchased another and acquired all of the second's newsprint contracts. During this time officers of the Globe-Democrat made numerous trips to Canada and throughout the United States in an attempt to secure additional newsprint. There was none available at normal or regularly established prices. Globe-Democrat received an offer of 250 tons of newsprint per month on a three-month basis at $185 a ton. Copley Press, Inc., publishes five newspapers in Illinois. Because of the newsprint shortage in 1951, Copley did not have *71 enough newsprint to publish all of the papers it otherwise could have. This situation was considered somewhat desperate. Gefaell and Cooper conducted the second meeting and the separate caucuses. It was represented to the publishers that petitioner would supply them with newsprint if they purchased William's stock. Neither Pulpaper nor Gefaell had any financial interest in any commission to be earned by the sale of William's stock. Pulpaper was interested in obtaining a supply of newsprint for the publishers as Great Lakes Paper Company was planning to build a new paper machine and it hoped to take over as a supplier of these publishers when the new machine was completed. During the course of the meeting, the publishers made it clear that they were interested in purchasing William's stock only if petitioner would agree to supply them newsprint. Cooper had been informed from the very beginning that William was opposed to making newsprint and that it would be impossible to obtain a contract while William was still president of the company. Pulpaper knew, however, that Harold would be willing to make newsprint for a supply of sulphite. William's only concern at this meeting was *72 the sale of his stock. The greater part of the first day of the conference was spent negotiating the stock sale. William, in talking with Cooper and Gefaell, had asked for a price in excess of $700,000 but, when the proposition was presented to the publishers, the price for William's stock was $700,000. Harold tried to have William offer his stock for the lowest possible sum since he felt that petitioner could not remain in business unless William sold out. After the negotiations for the sale of William's stock had been completed, the meeting discussed the terms of the newsprint contract. One subject discussed was the price which the publishers were to pay. Harold originally asked for a price of $147 per ton and the newspapers negotiated for a lower price. At that time Pulpaper was demanding a commission of $10 per ton on each ton of newsprint sold. Harold thought that the publishers would not pay much more than $142 per ton. Not wanting to reduce petitioner's price by $5, he persuaded Gefaell to reduce Pulpaper's commission by $2.50 if petitioner would take a $2.50 per ton reduction. Therefore, the asking price of $147 per ton was reduced to $142. C. A. Weis acted as spokesman *73 for the other publishers at the meeting and insisted upon a clause giving the publishers the right to cancel their commitments to take newsprint over the contract's three-year period. Harold argued this point but finally agreed to it with the provision that if the publishers cancelled they would pay liquidated damages $15of per ton for the number of tons of paper they did not take. Another subject of negotiation was petitioner's insistence that the newsprint price be subject to an escalator provision. It was finally agreed that the price would be adjusted either up or down depending upon whether the cost of production increased or decreased from those set forth in the newsprint contracts. A further subject of discussion was the term of the contract and the scheduling of the deliveries of newsprint. Harold insisted upon a three-year contract with the tonnage reduced during the third year to give petitioner some extra capacity with which to rebuild tissue sales during this year of transition. The publishers wanted more newsprint over a shorter period. Further negotiation at the meeting developed over the quality of the paper, cores, weight of the paper and other technical matters. *74 Harold argued some of these points although he was not greatly concerned about them. William played no part in negotiating this newsprint contract and was not present during most of the newspring negotiation. There was a degree of dissension between William and Harold at the negotiations. On July 10, 1951, Gefaell, as vice president and treasurer of Great Lakes Canadian Inc., wrote petitioner a confirmation of an understanding whereby the writer agreed to supply petitioner with approximately 65 tons of sulphite pulp per month for three years from Great Lakes Paper Company, Ltd., commencing August 1, 1951, in addition to petitioner's existing contract supply. The writer was to obtain a renewal of the old contract until the end of July 1954. The price for the sulphite was to be the regular contract price, with petitioner agreeing to execute the renewal. On July 10, 1951, petitioner, by Harold, wrote Pulpaper a letter confirming an understanding that Pulpaper had given valuable assistance in getting the three-year newsprint contract for petitioner and that Pulpaper was to get a $7.50 per ton commission in consideration for these services. Pulpaper was also to get its $7.50 per ton *75 for tonnage which the publishers might cancel and pay petitioner $15 per ton liquidated damages, but was to receive no commission on cancelled tonnage if petitioner got no liquidated damages. Gefaell accepted this letter for Pulpaper. About a week after the Chicago conference the parties met in St. Paul to execute contracts which had been drawn pursuant to the Chicago agreements. On July 16, 1951, William sold three shares of stock in petitioner to petitioner for $4,761.90 per share. Thereafter, Harold and his family owned 150 shares, and William and his family owned 147 shares. On July 16, 1951, William, his wife, and children, McClatchy, the Globe-Democrat, the Ridder group, and Copley executed an agreement under which 147 shares of stock in petitioner were sold to the publishers. Under the agreement the sellers warranted their title and right to sell; they represented that petitioner had authorized capital stock of 300 shares; they warranted a statement of assets and liabilities of petitioner as of December 31, 1950, and agreed to pay the publishers 49 per cent of any undisclosed liabilities in excess of $5,000 except tax liabilities, provided that such liabilities were disclosed *76 or asserted within three years. It was further agreed that the closing would be held on the same day, at which time the stock would be delivered to the purchasers and the payment of approximately $700,000 would be made to William. The publishers each received the following amount of stock at $4,761.90 per share: Publisher
No. of Shares
Total Price
McClatchy
63
$299,990.70
Globe-Democrat
45 1/2
216,666.45
Ridder group
21
$ 99,999.90
Copley Press
17 1/2
83,333.25
Total
147
$699,990.30
On July 16, 1951, petitioner, by Harold, who became its president and general manager on that date, entered into a contract with each of the four publishers for the sale of newsprint. Under each of these contracts, which were identical except for the amounts of newsprint, petitioner agreed to manufacture and sell to the publisher an annual tonnage of newsprint during each of the first two years of the contract terms and approximately half such annual tonnage during the third year of the contract term. Each publisher agreed to pay $142 per ton for the newsprint, f.o.b. petitioner's mill. This price was subject to adjustment for increases or decreases in the cost of *77 labor, sulphite pulp, purchased groundwood, logs, coal and power. The publisher was given the option of cancelling the contract by giving ninety days' written notice and paying liquidated damages of $15 per ton for all cancelled tonnage. Petitioner was excused from liability for failure to deliver newsprint caused by events beyond its control but was required to make up the lost tonnage at the end of the contract term. If such events prevented petitioner from manufacturing newsprint during a continuous period in excess of 120 days, the publisher was given the right to cancel without payment of liquidated damages. Petitioner was given the right to preship a certain amount of newsprint. The contract contained a number of additional terms relating to quality of the paper, cores, weight of the paper, terms of payment and other matters. The newsprint contracts provided that the agreed cost of manufacturing newsprint as of July 16, 1951, was $127.11, consisting of the following factors: Number of
Per Unit
Amount
Factor
Units
Rate or Price
Per Ton
Mill labor (hours)
15.38
1.14
$ 17.54
Sulphite (tons)
.245
159.025
38.96
Purchased groundwood
.274
114.03
31.24
Wood (cords)
.533
32.00
17.06
Coal (tons)
.908
10.482
9.52
Power (k w hours)
329.
.00792
2.61
Other factors
10.18
Total accepted cost of manufacture
$127.11
*78 The first five factors were considered variable. The yearly amounts to be delivered to each of the publishers during the three-year period beginning July 17, 1951, were as follows: Total
First Annual
Second Annual
Third Annual
Publisher
Purchased
Period
Period
Period
McClatchy
9,432
3,858
3,858
1,716
Globe-Democrat
6,812
2,787
2,787
1,238
Ridder
3,144
1,286
1,286
572
Copley Press
2,620
1,072
1,072
476
Total
22,008
9,003
9,003
4,002
The freight rates from Ladysmith to the delivery points for the four publishers were as follows: Per Ton
Per Ton
Prior to
After
Aug. 28,
Aug. 28,
Publisher
1951
1951
McClatchy
(Sacramento, California)
$30.60
$32.44
Globe-Democrat
(St. Louis, Missouri)
9.00
9.54
Ridder group
(St. Paul, Minnesota)
4.00
4.24
Copley Press
(Springfield, Illinois)
9.00
9.54
In its newsprint contracts with the publishers, petitioner agreed not to manufacture any paper on its 100-inch machine other than newsprint if it was delinquent in its newsprint commitments under the contract. Pursuant to the stock purchase agreement with William and his family and the individual *79 newsprint contracts with petitioner, the four publishers acquired 147 shares of petitioner's stock and the right to receive delivery of 22,008 tons of newsprint over a three-year period as follows: Stock Purchase Agreement
Newsprint Contracts
Number of
Percentage
Tons
Percentage
Publisher
Shares
Purchased
Contracted
Contracted
McClatchy
63
42.857
9,432
42.857
Globe-Democrat
45 1/2
30.953
6,812
30.953
Ridder
21
14.286
3,144
14.286
Copley Press
17 1/2
11.904
2,620
11.904
Totals
147
100.
22,008
100.
An understanding, referred to as a "gentleman's agreement," was discussed among some of the publishers and William and Harold, or their families, regarding the manner in which the publishers would record the excess of the contract price of the stock over its book value for their accounting or tax purposes. On July 16, 1951, Harold, his wife and children, and the four publishers executed an agreement in consideration of the newsprint contracts, whereunder which Harold and his family promised that during the term of the newsprint contracts they would not sell, pledge, or transfer their stock in petitioner to persons outside *80 the family. They also agreed they would not vote their stock for the issuance of any additional shares by petitioner and promised to indemnify petitioner from any liability which it might incur to the publishers for breach of the newsprint contracts should Harold and his family elect any director or officer who authorized a breach of the contract. Joseph Ridder was elected as a member of the board of directors of petitioner. He served in this capacity for approximately one year. Thereafter, C. A. Weis of the Globe-Democrat was elected by the publishers and served as their representative on the board of directors. Weis took an active interest in petitioner's financial affairs and had numerous telephone conferences with Harold as well as an exchange of correspondence of 20 or 30 letters over a two-year period. On July 19, 1951, Harold, as president of petitioner, wrote to the Office of Price Stabilization regarding establishment of a ceiling price for its sale of newsprint. This letter stated that petitioner, a manufacturer of sanitary tissue, had no sales of a comparable category or production line during any base period from July 1, 1949, to June 24, 1950. It stated that the *81 nearest closely competitive seller which did not customarily manufacture newsprint was allowed a ceiling price of $210 per ton, freight allowed, and petitioner sought this $210 price for its sales to newspaper publishers. Its unit direct cost was stated to be $116.93 per ton. On August 7, 1951, Harold sent a second letter to the OPS in which he stated: That he had received a letter from the OPS dated August 4, 1951; that petitioner did not make newsprint during base periods from July 1, 1949, to June 24, 1950; that petitioner did make 425 tons for the Milwaukee Journal during the [period] December 19, 1950, to January 26, 1951; that the Milwaukee Journal was a former stockholder in petitioner for whom petitioner contracted to make 1,500 tons starting on December 1, 1950, at $170 per ton f.o.b. Milwaukee, a price basis "on which we cannot come out profitably as a general practice"; and that future sales would be made to other than the Journal. In conclusion, Harold sought a ceiling price in accordance with his July 19, 1951, request. A representative of McClatchy was concerned lest the newsprint contract violated any OPS ceiling prices. After personally speaking to men in the *82 OPS, Harold, on August 22, 1951, wrote to McClatchy that, at least temporarily, petitioner apparently had a ceiling price of $170 per ton, f.o.b. the mill, based on the sale of about two tons to the Superior Telegram, invoiced on January 17, 1951. On July 18, 1951, petitioner began sending a weekly bulletin to its new stockholders in order to keep them informed of petitioner's progress with newsprint production and deliveries. The newsprint commitments of petitioner to the four publishers was a small part of the publishers' total requirements. The bulk of their newsprint was supplied by Canadian mills at prices ranging from $107 to $121 per ton delivered. On May 23, 1952, Copley Press exercised its contract right to cancel further newsprint deliveries. Cancellation was effective as of the end of August 1952, and Copley was to pay the $15 per ton cancellation charge. The Globe-Democrat also found that it did not need petitioner's newsprint in early 1952. However, the Globe-Democrat did not wish to pay the $15 cancellation charge and it also wished to retain petitioner's commitment in case newsprint demand again exceeded supply. Globe-Democrat therefore advertised for the sale *83 of petitioner's newsprint. On April 4, 1952, Globe-Democrat entered into a contract with the Wichita Eagle Publishing Company, Wichita, Kansas, under which the latter agreed to purchase at a price of $145 per ton, f.o.b. Ladysmith, 800 tons of the newsprint that Globe-Democrat was obligated to buy from petitioner. There was no common ownership between Globe-Democrat and the Wichita Eagle. Later, additional sales were made to the Wichita Eagle at $128 and $134.50 per ton, f.o.b. Ladysmith. The other publishers considered cancelling their contracts, but were concerned that another shortage of newsprint might develop and desired to have petitioner's supply available, if needed. They requested an amendment of their contracts. Harold did not feel that the amendment would be a good thing for petitioner but he wanted to keep the publishers as stockholders and therefore he agreed to discuss such an amendment. As a result of their discussions, the newsprint contracts with McClatchy, Ridder and the Globe-Democrat were amended in the summer of 1952. At that time Copley had already cancelled its tonnage but petitioner offered Copley the right to reinstate the contract with a similar amendment. *84 Under the amendment the originally agreed tonnage was to be delivered during the year 1952. Thereafter, the balance of the tonnage was to be manufactured and delivered in approximately equal quarterly installments over a three-year period beginning January 1, 1953. The publishers were each given the opportunity to cancel their tonnage quarterly instead of having to cancel the entire contract. $15The per ton liquidated damages had to be paid whenever the tonnage was cancelled. Copley declined to reinstate its contract with this amendment. On September 16, 1952, Ridder cancelled delivery of newsprint for the first quarter of 1953 and on December 24, 1952, cancelled the balance of tonnage for which it had contracted, in each instance paying liquidated damages. The Globe-Democrat cancelled delivery of newsprint for the second quarter of 1953 on December 30, 1952, and on November 16, 1954, cancelled the balance of its contract, in each instance paying liquidated damages. During 1952, petitioner experienced losses due in part to converting its equipment from production of newsprint to production of tissue. On December 30, 1952, Weis of the Globe-Democrat wrote petitioner in part *85 acknowledging receipt of notice of a stockholders' meeting to be held on January 2, 1953. The letter requested immediate information of any special matters to be considered at the meeting and suggested that in the future arrangements be made to give stockholders more advance notice of meetings and detailed information concerning the nature of the business to be transacted. On December 24, 1953, Weis wrote Harold concerning notice of a stockholders' meeting to be held at petitioner's office on January 2, 1954. The letter referred to previous correspondence regarding the short notice given of such meetings and recommended that provisions should be made in the bylaws of the corporation for an annual stockholders' meeting at a convenient time and place which would permit the review of yearly financial statements and conditions. On December 30, 1953, Harold Peavey replied to Weis's letter stating in part: The notice you received of the stockholders' meeting called for January 2nd was a routine. Perhaps, in view of your expressed desire, we should give some consideration to actually holding such a meeting. It no doubt should be held in St. Louis. Representatives of the four publisher *86 stockholders attended a shareholders' meeting at the time they purchased the stock in order to elect a director and officers. They also voted their stock on occasion. However, after the date of purchase, the publishers were not represented at any formal shareholders' meetings of petitioner although two or three informal meetings were held. In November 1952, Harold prepared a letter addressed to the Geo. C. Jones Co., Minneapolis, Minnesota, concerning the need of $200,000 to $250,000 of additional funds for expansion by petitioner. After reviewing petitioner's history, including the 1946 stock sale to the Journal Company and the 1951 contracts with the four publishers, the letter then stated: These publishers presently own 49% of the common stock of the Peavey Paper Mills. In return for the purchase of said stock, the corporation agreed to supply these companies with 22,000 tons of newsprint over a 2 1/2 year period at cost plus $7.50 per ton. This contract was amended in July, 1952 to extend the deliveries of newsprint over a three year period instead of the 1 1/2 years that remained and to allow the publishers the opportunity to cancel their tonnage quarterly, if they so desire, *87 upon paying a penalty. At the present writing these publishers do not want newsprint and it does not appear that they will again want it unless there is another national emergency. The publishers, representing 49% of the ownership, are very much in accord with this expansion program. * * * The year 1952 is in some ways a repetition of 1949. The profit this year will be very small (about $25,000) and the reason is the changing back to tissue after running newsprint for over a year. The years 1949 and 1952 prove to point out that the corporation was severely penalized to make William Peavey a rich man. It is the humble opinion of Harold J. that he himself handled all negotiations involving the stock transactions to the best of his ability at all times with the interest only of the corporation in mind. * * * The newsprint ventures in the past six years have injured our sales volume mostly due to the fact we had to curtail shipments of tissue at a time our customers had ready sale for it. This evil, of course, has now been eliminated. The potential tissue volume of our mill at present speeds is about 36,000 cases per month and we are convinced that under anywhere near normal economic conditions *88 we can sell this volume of paper profitable. * * * On November 29, 1952, in transmitting a copy of the above-mentioned letter to John Hamlyn of McClatchy, Harold stated: We are enclosing herewith a copy of a letter outlining the history of our company and the reason we need this loan. I would sincerely appreciate it if you would write a letter outlining your position regarding this loan. On December 30, 1952, Hamlyn replied to Harold's letter stating that McClatchy had no objection to the borrowing proposed by petitioner. Hamlyn had no recollection of any other attempts by petitioner to borrow for the purpose indicated in the letters. Petioner was apparently unable to obtain a loan. Petitioner did not produce newsprint after 1952. On September 1, 1953, Copley informed Harold L. Peavey that it had an offer to sell its stock in petitioner and gave him an opportunity to purchase it. The offer was made by Shawano Paper Mills of Shawano, Wisconsin. Shawano was interested in having some participation in the management of petitioner and it contacted Harold in this regard. Harold stated that he did not see the need of having a conference on the matter and Shawano lost interest in *89 purchasing the stock. Globe-Democrat contacted Gefaell in an attempt to have him sell its stock in petitioner. Other possibilities for disposing of the stock were also considered, but no purchaser was found. During 1954 the four publishers made an offer to sell their stock to Harold or petitioner. The offer contemplated alternative proposals of selling price and terms of payment. At that time Harold did not believe that petitioner's capital was sufficient for it to buy its stock back. During 1954, at the time of negotiations for the purchase of stock from the four publishers, Harold, as president of petitioner, had his son and assistant prepare a schedule and summary of the amounts paid by the four publishers under the newsprint and stock purchase contracts. The schedules were prepared by totaling (1) the amount paid by each publisher for newsprint delivered (contract price per ton plus freight per ton); (2) the amount each publisher had paid under the contract for petitioner's stock; and (3) the amount paid by or due from each publisher as the result of cancellations of the newsprint contracts. This total was then divided by the number of tons shipped and the resulting figure *90 designated total paid per ton of newsprint. An amount of $214 was then subtracted from this total and the result designated amount paid more or less per ton than original estimate. The individual schedules pertaining to the four publishers were as follows: McClatchy
Tons of news shipped
5.407.9
Price per ton
$142.00
Freight per ton
35.53
Amount paid for total news received
$ 960,064.49
Amount invested in stock
299,990.70
Amount paid or due on Cancellation
61,363.50
Total
$1,321.418.70
Total paid per ton of News
244.35
Less
214.00
Amount paid more per ton than original guess
$ 30.35
Amount invested in stock
164,129.76
Amount invested per share of stock
2,605.23
St. Louis [Globe-Democrat]
Tons of news shipped
3,874.4 (660 to Wichita)
Price per ton
$142.00
Freight per ton
10.42
Amount paid for news received
$ 590,536.05
[ 489,938.80]
Amount invested in stock
216,666.50
Amount paid or due (Cancellation)
44,064.00
Total
$ 851,266.55
[$ 750,669.30]
Total paid for ton of news
219.72
[ 233.55]
Less expected
214.00
Amount paid more or less per ton
$ 5.72
[ 19.55]
Total amount invested in stock
[$ 62,841.52]
Total amount invested per share
$ 138.11
St. Paul [Ridder Group]
Tons of News shipped
1,821.6
Price per ton
$142.00
Freight per ton
4.75
Amount paid for total news received
$ 267,319.80
Amount invested in stock
99,999.90
Amount paid or due on cancellation
19,836.00
Total
$ 387,155.70
Total paid per ton of news
212.54
Less
214.00
Amount paid less per ton
$ 1.46
Total amount invested in stock
2,659.54
Total amount invested per share
126.64
Copley
Tons of news shipped
1,415.3
Price per ton
$142.00
Freight per ton
31.70
Amount paid for total news received
$ 245,837.61
Amount invested in stock
83,333.25
Amount paid or due (Cancellation)
24,045.00
Total
$ 353,215.86
Total amount paid for ton of news
$ 249.57
Less
214.00
Amount paid more per ton
$ 35.57
Total amount invested in stock
23,907.84
Total amount invested per share
1,366.16
*91 These individual schedules were summarized as follows: Resume Newspapers
Total amount all papers have invested in our stock
$ 290,701.50
Book value of 49%
278,717.39
Total News shipped on contract calling for 22,008 tons
12,120 tons
Total paid by papers
$2,743,275.85
On or about December 20, 1954, petitioner purchased all of its stock held by the four publishers for $711.13 per share. The purchase price was to be paid over a five-year period with interest at the rate of five per cent on the unpaid balance. This price to be paid per share was negotiated and represents one-half the May 31, 1951, book value of the stock. The purchase price of the stock represented the best and only price the publishers could obtain for a minority interest in petitioner. The publishers' principal interest at this time was to establish their loss and realize something on the over-all transaction. McClatchy recorded the amount it had paid under the contract for petitioner's stock as an investment until the time it was sold. The stock was subsequently sold at a loss and the amount of the loss was treated as an expense relating to the prior years when the newsprint was delivered. *92 In considering the advisability of purchasing William's stock in 1951, Globe-Democrat regarded the full contract price of the stock it was to purchase ($216,666.45) as an additional cost of obtaining newsprint. This amount was divided by the number of tons of newsprint to be delivered (6,812) and the resulting figure ($31.81) was added to the contract price per ton of newsprint ( $142) to determine whether the expenditure would be wise. The price of $173.81 per ton was higher than the Globe-Democrat had been paying for standard newsprint under long term contracts, but less than it had paid on other occasions. For income tax purposes, Globe-Democrat originally treated its 45 1/2 shares of Peavey Corporation stock at a cost of $1,422.25 per share, or a total of $64,712.38. The balance of the contract price of the stock ($151,954.07) was treated as a deferred cost of newsprint under the newsprint contracts. This deferred amount was to be attributed to the newsprint on a per tonnage basis as it was delivered or cancelled at a rate of $22.31 per ton. This amortization was disallowed by the Internal Revenue Service for the year 1951. Globe-Democrat was permitted to deduct as an ordinary *93 loss for the year 1954 the difference between the cost of the stock in 1951 and the proceeds from its sale in 1954. The determination by the Globe-Democrat of how much of the cost of stock should be written off for tax purposes as an ordinary loss or as an ordinary expense of purchasing newsprint was based temporarily on balance sheets, income statements and business reports as to estimates of revenue and expenses provided by petitioner. The final determination, however, was made by reference to the price at which the stock was resold to petitioner. This determination was made in order that the Globe-Democrat might as accurately as possible ascertain the cost per ton of newsprint under the contract which could be charged off for tax purposes. In 1951, Globe-Democrat would have been willing to contract for newsprint at the estimated price of $164 per ton. Ridder, for income tax purposes, wrote off or amortized the difference between the contract price of the 21 shares of Peavey Corporation stock it purchased and the December 31, 1950, book value of the stock in the years 1951 and 1952, as an additional cost of newsprint under the contract at the rate of $23.52 per ton. Originally *94 Copley treated the entire cost of its purchase of William's stock as an investment in stock. This treatment was changed in 1952. In a letter dated March 24, 1954, from Copley's secretary-treasurer to its president, the purchase of William's stock was analyzed as follows: Total
Per Share
Cost of 17 1/2 shares
$83,333.25
$4,761.90
Book value (5/31/51)
24,889.34
1,422.25
Excess over book value
58,443.91
3,339.65 The letter states that the excess of the contract cost over the book value of the stock was, for income tax purposes, written off as an expense of obtaining the newsprint contract, but that an agent of the Internal Revenue Service had disallowed this treatment. According to financial statements prepared for the four publishers the book value of the outstanding Peavey Corporation stock as of May 31, 1951, was $1,422.25 per share. The book value of the outstanding stock according to the December 31, 1950, balance sheet attached to the newsprint contracts was $1,240.56 per share. The fixed assets petitioner owned in 1951 may be summarized as follows: 1. Approximately 14 acres of land on which its plant was located. Its main building, which housed *95 the paper machines and the beater room, was about 200 feet wide and 250 feet long with a basement beneath it. This building was on one side of the Flambeau River. On the other side of the river was a groundwood mill about 50 feet wide and 80 feet long plus a wood room, with a basement beneath it, about 100 feet wide and 200 feet long. 2. Two machines. One would produce a sheet of paper which would trim 103 inches wide and had the capacity of producing, on the average, 33 tons of newsprint per day. With an investment of. $100,000 to $150,000, its capacity could have been increased to 45 tons per day. The second machine would produce a sheet of paper which would trim 83 inches wide and had the capacity to produce, on the average, 12 tons of newsprint per day. With more investment, capacity also could have been increased. 3. Converting equipment which was used to convert jumbo rolls into consumer products. 4. Many other miscellaneous buildings and items of machinery and equipment. On January 1, 1951, the books and records of petitioner showed that petitioner owned fixed assets consisting of land, buildings, machinery, and office furniture and fixtures having a total cost of $427,785.67. *96 The books showed reserve for depreciation of $319,925.57, and a net fixedasset balance of $107,860.10. The following amounts were reported on the Federal income tax return filed by petitioner for its taxable year 1951: 1. Gross sales
$2,449,788.15
Less: returns &
allowances
159,674.73
$2,290,113.42
2. Less: cost of goods sold
1,805,847.45
3. Gross profit from sales
$ 484,265.97
14. Other income
2,966.43
Total
$ 487,232.40 No part of the amount paid William in 1951 under the contract for the purchase of his stock was reported by petitioner. On January 3, 1957, March 6, 1957, July 8, 1957, November 20, 1957, April 4, 1958, and September 24, 1958, petitioner executed and filed with the district director of internal revenue at Milwaukee, Wisconsin, consents extending the period of limitations for assessment of income tax for the taxable year 1951, to November 30, 1958. These consents contain the express qualification that they were not valid unless the provisions of section 275(c) of the Code of 1939 are applicable. The statutory notice of deficiency pertaining to the taxable year 1951 was mailed to petitioner on November 21, 1958. Opinion
*97 In order to prevent the statute of limitations from barring the deficiency determined for the year 1951, respondent must prove that petitioner omitted from gross income over 25 per cent of the amount of gross income stated in the 1951 income tax return. Section 275(c), [1] Code of 1939. With respect to compliance with section 275(c), the presumption of correctness does not attach to respondent's determination, and respondent bears the burden of proof. Frank W. Williamson, 27 T.C. 647, 659 (1957); Sidney N. LeFiell, 19 T.C. 1162, 1179 (1953). *98 Respondent takes the position that petitioner omitted over 25 per cent of the gross income declared on its 1951 return in that it did not properly reflect the actual nature of William Peavey's stock sale and petitioner's tie-in sale of newsprint. Respondent maintains that the two agreements were in reality one transaction whereby the publishers purchased William's stock for its fair market value. namely, its book value, as of May 31, 1951, and purchased newsprint for $142 per ton plus the amount by which the stated consideration for William's stock exceeded its fair market value. Respondent contends that this overage between the contract price for the stock ($4,761.90 per share) and its fair market value ($1,422.25 per share) must be considered income to petitioner since it is part of the newsprint price. In order to sustain his burden of proof under section 275(c) in this case, respondent must prove by a preponderance of the evidence that the fair market value of a 49 per cent interest in petitioner's stock as of July 16, 1951, was sufficiently below $4,761.90 per share so as to result *99 in the overage constituting more than 25 per cent of petitioner's reported gross income. We do not believe that respondent has met this burden. In attempting to prove the fair market value of William's shares, respondent has used the book value of these shares. We do not believe that book value alone, under the circumstances of this case, can present a fair picture of value. Use of book value would list petitioner's paper producing equipment at its depression cost less its reserve for depreciation. See Dumont-Airplane & Marine Instruments, Inc., 28 T.C. 1308, 1314 (1957), where we stated: A taxpayer's basis in property, standing alone, does not establish the fair market value of the property. Especially is this true in a time of extraordinary economic circumstances, such as a severe depression. * * * See also Ketler v. Commissioner, 196 F. 2d 822, 827 (C.A. 7, 1952) reversing and remanding 17 T.C. 216, on an issue not considered below, in which the Court of Appeals said, in part (p. 827): *100 It is quite evident that the book value of a stock is a very unreliable basis upon which to determine the fair market value. Book value frequently bears on relationship to actual cash value or fair market value. Anson Evans, 29 B.T.A. 710. * * * See also Berg v. United States, 167 F. Supp. 756, 762 (W.D. Wisc. 1958). The fact that the publishers also took note of book value is certainly not controlling, since it was a readily ascertainable figure which, in the opinion of the publishers, permitted use of amortization which would be immediately favorable in computing the publishers' income taxes. It should be noted, moreover, that the Internal Revenue Service did not take kindly to the publishers amortizing the cost of the stock over book value as a cost of newsprint. Respondent also cites the 1950 transaction whereby petitioner repurchased and retired its stock held by the Journal Company and paid the price of $1,000 per share for the 200 shares. The exact date of the purchase is not clear from the record. William's letter requesting an offer from the Journal Company indicates that the repurchase was made after July 21, 1950. We have considered this *101 transaction, and while we take note of it, we do not think that it is sufficient, in view of the circumstances of the newsprint supply for 1951, to meet respondent's burden of proving value as of July 16, 1951. Nor does the repurchase of its stock in 1954 by petitioner at about $711 per share seem to be particularly informative as to the value of the shares on July 16, 1951. Conditions in the paper industry had undergone a marked change by 1954. Respondent's citation of cases holding that sales of the same securities are important indicia of value are inapposite to the facts in the instant case, although, of course, sales of like securities are factors to be considered in their proper setting. The American Appraisal Company inventoried and determined the sound value of all the fixed assets, exclusive of land, owned by petitioner as of October 31, 1951, for insurance purposes. The fixed assets owned by petitioner on October 31, 1951, were substantially the same as those owned on July 16, 1951. This appraisal is a detailed listing of all petitioner's fixed assets and may be summarized as follows: Railroad siding
$ 1,824.00
Water Power Construction
23,185.15
Building Construction and Fix-
tures
584,916.09
Improvements to Leased Prop-
erty
2,918.08
Machinery and Equipment
1,290,731.42
Office Furniture and Fixtures
6,871.34
Auto Trucks
3,125.00
Total
$1,913,571.08
*102 Using this basis, the December 31, 1951, balance sheet would approximate the following: ASSETS: Current (Including cash, receiv-
ables and value of life insur-
ance)
$ 588,172
Plant and Equipment
1,913,571
Total Assets
$2,501,743
LIABILITIES: Current
$ 318,232
Common Stock 297 shares
29,700
Surplus
2,153,811
Total Liabilities
$2,501,743
Value per share, $7,352
In preparing this appraisal, the term "sound value" is used to represent the new replacement cost of petitioner's fixed assets less depreciation by classifications of property for each of the assets. To be sure, replacement cost may be as erroneous a figure for fair market value as book value. However, this appraisal is of some use in determining the cost of assets needed to produce paper and paper products as of July 16, 1951. The appraised value of $7,352 per share also does not take into account the fact that the 147 shares purchased by the publishers represented a minority interest, a fact which would detract from fair market value per share, since the majority interest was in the hands of Harold and his family. Petitioner introduced the testimony of three expert witnesses whose *103 qualifications and opinions follow. Charles J. DiCarlo is a graduate of Syracuse University with a degree in paper and pulp manufacture. He worked in paper mills for some years and since 1945 has been in business for himself, buying and selling pulp and paper mill machinery. He also builds complete paper plants and machines and has acted as a broker in the purchase and sale of complete paper machines and plants. He has been employed to make appraisals of the fair market value of their machinery, equipment, and buildings. During 1951, he had customers who wished to obtain paper mills. DiCarlo contacted practically every paper mill in the United States to determine whether they were for sale. In the ordinary course of his business he visited petitioner's plant about four times during 1951 and acquainted himself with its machinery and equipment and their condition. Based on his knowledge of the paper industry, the market for used paper machinery and plants, and his recollection of petitioner's fixed assets in 1951, DiCarlo testified that the fair market value of petitioner's fixed assets in 1951 was $1,400,000. Using this basis, petitioner's December 31, 1951, balance sheet would *104 reflect a value of about $5,623 per share for each of the 297 outstanding shares. This computation does not take into account the fact that William's 147 shares were a minority interest. George J. Lincoln, Jr., has been connected with the paper industry since 1912. He owned and operated a paper company which made disc milk bottle caps, which company he sold in 1925, but continued to work for the purchaser until 1931. He was general manager of another milk bottle cap company until 1933. Since 1933 he has been the executive secretary of a number of trade associations in the paper industry. In that position he receives and distributes statistics of the paper industry. He has been approached by paper companies desiring to acquire or merge with other companies, and has acted a middleman in the acquisition of about 20 paper companies. Based upon his knowledge of the paper industry, sales and mergers of paper companies, and his study of petitioner's position in the industry, assets and liabilities in July 1951, operating statements of petitioner from 1946 to 1954, Lincoln was of the opinion that the value of all petitioner's stock in July 1951 was $1,750,000. This would place a per share *105 value of about $5,892 on petitioner's stock, which calculation does not take into consideration the effect of a minority interest. Dr. Louis T. Stevenson has a mechanical engineering degree from Yale University and a Ph.D. from New York University. His doctoral thesis concerned the economics of the United States paper industry. He worked with a paper manufacturer for 23 years beginning as an engineer and working up to the presidency of that company. He has been a manufacturer's representative for the sale of paper. He served with the War Production Board as a specialist in the paper industry and for 10 years served the American Paper & Pulp Association as a specialist in charge of statistics and economic research. Since 1943, he has been associated with an investment firm and has specialized in the economics of the paper industry. He has done much writing on subjects concerning the paper industry and was at the time of trial the consultant employed by the American Newspaper Publishers Association to forecast newsprint consumption through 1970. A report to petitioner by Dr. Stevenson was introduced in evidence. One of the computations contained in this report was the analysis of *106 another paper mill sale in 1951. This analysis broke down the purchase price in terms of inches of trim of newsprint capacity and projected the unit price to petitioner's capacity. On the basis of this other sale, petitioner's business would have been worth $13,030 per share. Based upon his knowledge of the paper industry, sales and exchanges of other companies, and his study of petitioner's economic position and history, and assets and liabilities on July 17, 1951, it was the opinion of Dr. Stevenson that the fair market value of 147 shares of petitioner's stock on July 16, 1951, was at least $4,800 per share. The testimony offered by petitioner's expert witnesses serves to indicate the wide range within which a given unlisted interest may be valued. The range becomes even wider when respondent's use of book value is considered. The second phase of the transaction consummated on July 16, 1951, between petitioner and the four publishers involved the three-year contracts for the supply of newsprint at $142 per ton, f.o.b. Ladysmith, subject to an escalator provision upon the increase or decrease of production costs. Respondent has requested a finding that the fair market value *107 of newsprint on July 16, 1951, was not less than $164.31 per ton, f.o.b. Ladysmith. Respondent's requested finding is based on the testimony of Weis of the Globe-Democrat who stated that he would have been willing to pay $164.31 for newsprint. This testimony was given by Weis in rationalizing the amortization attempted by Globe-Democrat for tax purposes. This figure was based on petitioner's book value on May 31, 1951. The record contains no statements by the other publishers that they would have been willing to pay the $164 price. Nor do we have any evidence as to how much newsprint and over how long a period would any of the publishers have paid $164. The record is confusing as to the exact sequence of events which transpired prior to and at the first Chicago meeting. It appears that the leasing arrangement proposed by Kander and "B" was discarded by the parties early in this meeting, or prior to the meeting. A contract whereby William was to sell his stock for $925,000 was executed and voided when it was determined that "B" had signed a name other than his own. The publishers came to Chicago with the impression that they were going to pay spot prices for newsprint. Yet the contracts *108 finally worked out were for a three-year duration, which certainly does not meet any of the witnesses' definition of a spot sale. At the time of the first Chicago meeting, petitioner was beset with a sulphite pulp shortage sufficient to severely curtail its operations. The contracts negotiated with the publishers through the efforts of Gefaell resulted in petitioner receiving an assured three-year supply of unbleached sulphite, without which newsprint could not be produced. The unbleached sulphite could be used in petitioner's tissue production even though bleached sulphite was preferable. Prior to the contract with the four publishers, petitioner had sold newsprint to the Kansas City Star for $135 per ton in order to get some sulphite at the prevailing market price. Harold's testimony indicates that there was negotiation between petitioner and the publishers concerning the newsprint price. It would seem impossible to separate these negotiations from Gefaell, who had access to the needed sulphite and who wished to keep the publishers supplied with newsprint until such time as he could complete a Canadian mill which would take over a portion of the publishers' newsprint requirements. *109 Petitioner's earlier unsuccessful efforts to purchase additional sulphite from Gefaell clearly demonstrate that, in fact, petitioner could not get sufficient sulphite to meet its tissue needs. Gefaell's hopes of supplying the publishers in the future would seem to rule out any possibility of his participating in any arrangement whereby he would supply petitioner with sulphite for newsprint production at a price to the publishers which they might consider excessive. The record indicates to us that petitioner sold its newsprint to the publishers at a three-year contract price. By making these contracts petitioner obtained a needed sulphite supply with which it could operate in the production of both newsprint and tissue. The reduced quantity of newsprint for the third year of the contracts enabled petitioner to gradually convert its production from newsprint to tissue and still maintain a source of sulphite. In view of the conditions operative in the paper industry in 1951, we do not believe that respondent has proved that the price of $142 per ton, f.o.b. Ladysmith, as part of a three-year contract, was less than the fair market value of the newsprint. We add that the transaction *110 appears to have been concluded at arm's-length and in good faith. As to petitioner's letters to the OPS requesting a ceiling price of $200over per ton for newsprint, we tend to accept Harold's explanation that this was done in order to allay the fears of McClatchey that the $142 price f.o.b. Ladysmith might be in violation of an OPS ceiling price if freight to McClatchey were included in the price of the newsprint. Respondent cites the case of Particelli v. Commissioner, 212 F. 2d 498 (C.A. 9, 1954), which affirmed a Memorandum Opinion of this Court. In Particelli, the taxpayer owned a winery which had a wine inventory of 275,000 gallons. The wine had cost about fifty cents a gallon to produce. The OPA ceiling price on the wine was 28 cents per gallon. A wine buyer offered to purchase the taxpayer's wine, but taxpayer refused to sell the wine at a loss when, in fact, wine was in current demand. The taxpayer offered to sell the wine together with the winery for a total price of $350,000. The prospective buyer reasoned that even at this price he could profitably purchase the wine for resale, even though he had no desire to purchase a winery. The buyer let the taxpayer *111 draw up the contract of sale making any allocation the taxpayer wished, so long as the total consideration did not exceed $350,000. The taxpayer had the contract drawn to state a consideration of $77,000 for the wine, which amount then met the OPA ceiling price for wine, and $273,000 for the winery, and the contract as so drawn was executed. After the sale, but prior to the settlement date, the taxpayer withdrew 1,000 gallons of wine for his own personal use and agreed to be charged for this wine at the rate of $1 per gallon. In transferring title to the winery the taxpayer authorized the placing of revenue stamps on the deed which would support a value of $100,000 for the real property. Shortly after purchasing the winery, the buyer offered it for sale at a price of $60,000. No buyer could be found at that price. About one year later the winery was sold for $20,000. We held, and were affirmed by the Court of Appeals on this point, that the taxpayer did not sell his wine at a loss at the stated contract price, but instead, sold the wine at its fair market value of $275,000, and the winery for $75,000. This holding served to treat the $275,000 as ordinary income and $75,000 as capital *112 gain. We believe that Particelli is distinguishable for the following reasons: (1) The record in the case at bar indicates separate negotiations as to the price of the newsprint and the stock. There is nothing before us to prove that petitioner was able to allocate the total amount paid by the publishers as between stock purchased from William and the newsprint purchased from petitioner. (2) Petitioner did not sell the newsprint at a huge loss. It was to make a profit after paying Gefaell his commission even if the tonnage were to be cancelled. It was protected by an escalator clause. In addition, it received a sulphite supply. (3) The record shows no transaction similar to that in Particelli wherein some wine was sold by the winery buyer to the taxpayer for a price more than three times the value ascribed to the wine by the taxpayer. (4) In Particelli, the taxpayer had the burden of disproving respondent's allocation. In the case at bar, respondent has the burden of proving that the contract prices for the stock and newsprint did not in fact reflect fair market value. Respondent also cites Joseph Frank, 22 T.C. 945 (1954), affd. per curiam 226 F. 2d 600 *113 (C.A. 6, 1955). In Frank, petitioner received $50,641.30 from his former employer for the repurchase of stock and for bonus. Respondent determined, based on notations which the former employer placed on the checks which petitioner endorsed, that $18,701.02 was paid for the stock and that $31,940.28 was ordinary income. It was held that petitioner had not proved his contentions that he received $10,000 in settlement of a personal injury claim and that respondent's allocation as between ordinary income and capital gain was otherwise erroneous. Frank is distinguishable for two clearly apparent reasons: (1) Petitioner had the burden of proving respondent's determination erroneous in Frank, whereas in the case at bar respondent has the burden of proof in order to open the statute of limitations. (2) In Frank, there was no contract signed by both parties in which an allocation as between stock and bonus was made. Also distinguishable is Fox River Paper Corporation v. United States, 165 F. 2d 639 (C.A. 7, 1948), where it was held that the taxpayer had failed to prove, for purposes of determining basis for depreciation, that its preferred stock had a fair market value of *114 $100 rather than the $50 per share valuation determined by the Commissioner. Fox River Paper Corporation was decided on the burden of proof. It is to be noted, also, that the taxpayer was attempting to value obsolescent assets by using reproduction cost less depreciation. Our holding, upon the facts and record of this case, is that respondent has failed to prove by a preponderance of the evidence that the fair market value of the 147 shares conveyed by William Peavey on July 16, 1951, to the four publishers was less than $4,761.90, and that the respondent has also failed to prove that the fair market value of the newsprint sold by petitioner to the publishers on July 16, 1951, was greater than the contract price of $142 per ton, f.o.b. Ladysmith. The year 1951 is, therefore, barred by the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. * * *↩